[No. D061055. Fourth Dist., Div. One. Mar. 20, 2013.]

WILLIAM DAILEY, Plaintiff and Appellant, v.
SEARS, ROEBUCK AND CO., Defendant and Respondent.

COUNSEL

EMLS, Reza Keramati; Righetti Glugoski, Matthew Righetti and John Glugoski for Plaintiff and Appellant.

Winston & Strawn, Amanda C. Sommerfeld and Michelle S. Kunihiro for Defendant and Respondent.

OPINION

IRION, J.—

I

INTRODUCTION

William Dailey (Dailey), individually and on behalf of a proposed class of similarly situated individuals, sued Sears, Roebuck and Co. (Sears), alleging several causes of action arising from Dailey's core contention that Sears violated California's wage and hour laws, including those governing overtime pay and rest and meal breaks, with respect to its auto center "Managers" and "Assistant Managers" (collectively, the proposed class members). Dailey sought to certify the proposed class, arguing that his theory of liability is particularly well suited to class treatment. His alleged theory is that although Managers and Assistant Managers are categorically classified as exempt from

overtime and meal/rest break requirements, Sears implemented uniform policies and practices that have the effect of requiring the proposed class members to work at least 50 hours per week and spend the majority of their time working on nonexempt activities. Sears opposed Dailey's motion on the ground that determining how the class members actually spend their time requires individualized evidence and cannot be proven on a classwide basis. Earlier, Sears had filed its own motion to preclude class certification, asserting the same principal challenge that individual inquiries predominated in the case.

In a brief order, the trial court granted Sears's motion to preclude and denied Dailey's motion to certify the class, concluding that "the individual facts and issues unique to each member of the alleged class and requiring separate adjudication are more numerous and significant than the common issues." The court found that class certification is also inappropriate because bringing all individual class members' claims before the court in one action is "not impracticable," and Dailey is not a suitable class representative.

On appeal, Dailey principally contends the trial court abused its discretion in concluding commonality is lacking and that a class action is not the superior method for resolving his claims. Dailey also complains that the trial court erred in failing to provide a more detailed explanation for its ruling, in failing to deny the motion to preclude class certification as moot, and in refusing to continue the class certification hearing to permit more time for discovery. We conclude these contentions are without merit. We further conclude the trial court did not abuse its discretion in denying Dailey's motion to certify the class and granting Sears's motion to preclude certification. The record before us contains substantial evidence that Dailey's theory of liability—i.e., that Sears acted in a uniform manner toward the proposed class members, resulting in their widespread misclassification as exempt employees—is not amenable to proof on a classwide basis. In light of the wide latitude properly afforded the trial court in determining the propriety of class certification, we affirm.

## II

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *California Law Regarding Exempt Employees*

California's Labor Code generally requires overtime pay for employees working more than 40 hours in a given workweek. (Lab. Code, § 510, subd. (a).) However, the Legislature authorized the Industrial Welfare Commission to establish exemptions from the overtime pay requirement for

"executive, administrative, and professional employees, if the employee is primarily engaged in the duties that meet the test of the exemption, [and] customarily and regularly exercises discretion and independent judgment in performing those duties." (Lab. Code, § 515, subd. (a).) Industrial Welfare Commission (IWC) wage order No. 4-2001 governs exemptions for professional, technical, clerical, mechanical and other similar occupations. (See Cal. Code Regs., tit. 8, art. 4, § 11040, subd. 2(O) [this exemption includes those involved in "professional, semiprofessional, managerial, supervisorial . . . clerical, office work, and mechanical occupations"].) IWC wage order No. 7-2001 governs exemptions for the mercantile industry. (See Cal. Code Regs., tit. 8, art. 7, § 11070, subd. 2(H) [defining "mercantile industry" as including any business "operated for the purpose of purchasing, selling, or distributing goods or commodities at wholesale or retail; or for the purpose of renting goods or commodities"].)[1]

The IWC regulations regarding overtime pay, as well as rest and meal periods, apply to all employees except those employed in an executive, administrative or professional capacity. (See Cal. Code Regs., tit. 8, art. 7, § 11070, subd. 1(A).) They provide that a person employed in an executive capacity includes "any employee: [¶] (a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed . . . ; and [¶] (b) Who customarily and regularly directs the work of two or more other employees therein; and [¶] (c) Who has the authority to hire or fire other employees . . . ; and [¶] (d) Who customarily and regularly exercises discretion and independent judgment; and [¶] (e) Who is primarily engaged in duties which meet the test of the exemption. . . ." (Cal. Code Regs., tit. 8, art. 7, § 11070, subd. 1(A)(1).)

B.  *The Classification of Sears Auto Center Managers and Assistant Managers*

During the alleged class period, Sears provided automotive and tire maintenance and repair services, and also sold automotive products, at up to 16 auto centers located in Sears's San Diego auto center district—the area encompassed within Dailey's modified class definition that included stores in the California cities of El Cajon, Chula Vista, La Jolla, Carlsbad, Escondido, El Centro, Temecula, Hemet, Corona, Clairemont Mesa, San Bernardino,

---

[1] We reference both IWC wage orders here because Sears, in its answers to Dailey's original and amended complaints, alleged as an affirmative defense exemption pursuant to wage order No. 4-2001, but cited to wage order No. 7-2001 in its class certification opposition. However, these wage orders are substantively identical with respect to the nature and scope of the exemption at issue. Therefore, for simplicity's sake, we hereafter cite only IWC wage order No. 7-2001. (See Cal. Code Regs., tit. 8, art. 7, § 11070.)

Riverside, Moreno Valley, Victorville, and Palm Desert, and in Yuma, Arizona.[2] Depending on its sales volume, each auto center may be managed by one Manager, or one Manager and one or more Assistant Managers. Generally, auto centers do not have an Assistant Manager until they have close to $1.5 million or more in annual sales. Auto centers are also staffed with customer service advisors and technicians who handle sales and technical vehicle work, and possibly one or more store support representatives, who assist with inventory and picking up product at other stores.

Between late 2002 and mid-2007 (a timespan falling partly within the alleged class period), Managers and Assistant Managers had very similar job descriptions. About May 2007 (within the alleged class period), new job descriptions were put in place which reorganized the Manager position into different levels—"Auto Center Coach I, II and III." After the reorganization, those employed at the Auto Center Coach I and II levels were placed in charge of smaller stores with less than $500,000 in sales, were expected to spend more than 50 percent of their time selling and installing products and services, and were classified as salaried, *nonexempt* employees. In contrast, those filling the Auto Center Coach III position generally were "responsible for managing the entire Auto Center and Associates . . . in Auto Centers with sales volume of $500,000 or more." Managers with the Auto Center Coach III designation, along with all Assistant Managers, were "expected to spend well over 50 percent of [their] time on management duties on a daily and weekly basis" and were categorically classified as salaried, *exempt* employees who are not paid overtime.[3] (See Cal. Code Regs., tit. 8, art. 7, § 11070, subd. 1(A)(1).)

C. *Plaintiff's Lawsuit*

Plaintiff Dailey worked in the Carlsbad auto center as an Assistant Manager from October 2007 to February 2008, and then as a Manager until January 2009. In April 2009, he filed a lawsuit against Sears alleging violations of labor laws and regulations regarding overtime pay and rest and meal periods, as well as related claims for unfair business practices under Business and Professions Code section 17200 et seq., and failure to provide properly itemized wage statements, as required by Labor Code section 226, subdivisions (a) and (e), and Labor Code section 1174. Dailey filed the action

---

[2] The number of stores in the San Diego district was reduced to 12 in October 2011, when Sears realigned its auto center districts.

[3] The operative complaint in this case does not distinguish among the various Auto Center Coach job descriptions, nor is there any substantive discussion in the parties' briefs as to how the changes to these managerial job descriptions may have impacted the composition of the proposed class (which does not explicitly exclude the Auto Center Coach I and II positions). In his opening brief, Dailey states that the operative class definition includes only those Managers designated as Auto Center Coach III.

on behalf of himself and a proposed class of all "Automotive Managers" (including subclasses of Assistant Managers and Managers) who worked at Sears retail stores in the State of California during the prior four years. In December 2009, Dailey amended his complaint to add a claim under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, §§ 2698–2699.5).

The complaint alleged that, notwithstanding their classification as exempt employees, the Managers and Assistant Managers regularly spend more than 50 percent of their time performing nonexempt work, and do not regularly exercise discretion and independent judgment. It further alleged that although the proposed class members routinely work in excess of 40 hours per week, they are paid no overtime. The complaint sought class certification, alleging that Sears uniformly administers policies and procedures that effectively require Managers and Assistant Managers to spend the majority of their time on nonmanagerial, nonexempt work. Dailey also alleged that the duties of the Managers and Assistant Managers are "virtually identical" from store to store and from region to region. Finally, the complaint alleged that Sears routinely fails to provide the proposed class members with off-duty (i.e., uninterrupted) rest and meal periods.

D.   *The Motion to Preclude Class Certification*

Sears removed the action in February 2010, but the federal court remanded the case one year later. At a May 2011 case management conference, the trial court scheduled Dailey's class certification motion for hearing in October 2011 (although Sears had requested an earlier date). During the conference, counsel for Sears informed the trial court of Sears's intent to file a motion to preclude class certification, and the court directed Sears to file its motion on "statutory notice," meaning that it could be filed and heard before Dailey's motion for class certification. Sears thereafter filed its motion to preclude class certification, with a hearing date in September 2011. Sears principally argued in its motion both that individual issues predominated in this case, rendering class certification inappropriate, and that certification was collaterally estopped by virtue of an order denying class certification in a prior case against Sears—*Jimenez v. Sears, Roebuck and Co.* (Super. Ct. L.A. County, No. BC383006) (*Jimenez* action)—involving similar allegations and a proposed class that purportedly included Dailey.

During the pendency of Dailey's action (except during the one-year period of removal), the parties engaged in discovery, and continued to do so after the action was remanded from federal court. In August 2011, Dailey sought ex parte an order continuing Sears's motion to preclude class certification to permit additional time for discovery, and shortening time for a hearing on

Dailey's motion seeking leave to file a second amended complaint (SAC). The trial court granted Dailey's request to file the SAC, which Sears did not oppose, but it denied his request to continue the hearing on Sears's motion.[4]

On August 19, 2011, Dailey filed the operative SAC, which narrowed the scope of the proposed class from all retail stores in the State of California to those located "within the district of San Diego," but otherwise realleged the same factual allegations and causes of action. Thereafter, Dailey filed a response to Sears's motion to preclude class certification that only partly addressed the merits of the motion, and instead, principally asserted the motion had been rendered "moot" by the narrowing of the scope of the proposed class.

## E. *Dailey's Motion for Class Certification*

On September 30, 2011, Dailey filed his motion for class certification. Two weeks later, Dailey appeared ex parte requesting a continuance of the hearing on that motion so that additional discovery could be completed. Sears opposed the application, and the trial court denied it.

In support of his class certification motion, Dailey submitted his own declaration as well as the substantially similar declarations of five other proposed class members; counsel's declarations; Sears's job descriptions; the deposition testimony of Dailey, several Sears corporate managers, and four of the proposed class members who submitted declarations on Sears's behalf; and the expert declaration of Richard Drogin, Ph.D., proposing a sampling methodology to assist in determining the Managers' and Assistant Managers' work duties, the hours they worked, and damages. In opposition, Sears also submitted the deposition testimony of Dailey and several Sears corporate managers; the declarations of corporate managers as well as 21 proposed class members; and the declaration of its own expert, Joseph A. Krock, Ph.D., responding to Dr. Drogin's declaration.

The parties' evidence generally is not in conflict with respect to the Manager and Assistant Manager job descriptions and Sears's general expectations of how these employees will spend their time. Thus, there is no dispute that the Manager's designated duties include managing the workflow of the auto center, prioritizing and assigning tasks, setting work schedules, analyzing sales reports and developing sales goals and strategies. A Manager is also responsible for recruiting, hiring, coaching/training, disciplining and terminating other employees. Assistant Managers share in the performance of the

---

[4] Nevertheless, on its own motion the trial court later twice continued the hearing on Sears's motion, so that ultimately it was heard on the same day as the scheduled hearing on Dailey's motion for class certification.

Manager's functions. It is also essentially undisputed that these job descriptions and responsibilities apply at all auto centers.

By about 2005, Sears had phased in a new role called the "Customer Experience Manager" or "CEM." This was not a new position and does not have a job description. Rather, the role is either assumed by the Managers and Assistant Managers, or filled by someone they designate. The parties' evidentiary submissions diverge significantly as to the nature of the CEM role. Dailey's declarations submitted in support of class certification describe the CEM role generally as being responsible for customer service, and involving much of the same work as hourly employees, including checking in customers' vehicles, filling out paperwork, driving vehicles into the bays for service, gathering parts and even performing some mechanical work. In contrast, the Sears declarants describe the CEM's role as a managerial one focused on managing the workflow of the auto center, "especially between the 'front shop' where customers come in, and the 'back shop' where technicians work on customers' vehicles." The Sears declarants also state the CEM is responsible for "determining and coordinating who works on what jobs and making sure that resources and staff are allocated in the most efficient manner possible."

Although the parties' declarants characterize the CEM role differently, they agree that it constitutes a significant portion of the work performed by Managers and Assistant Managers. Both Dailey's and Sears's declarations also demonstrate that Managers and Assistant Managers, whether acting in the CEM role or otherwise, to some extent perform functions normally assigned to hourly, nonexempt employees, such as customer service, sales, inventory work and mechanical work. The parties' declarants fundamentally disagree, however, as to the amount of time these employees actually spend performing these nonexempt, nonmanagerial functions. Sears's declarants attest to spending in the range of 1 percent to 40 percent of their time on such tasks, while Dailey's declarations state they routinely spend in the range of 75 percent to 90 percent of their time performing nonexempt work.[5]

Dailey emphasized in his motion that "[t]he work performed by [Managers and Assistant Managers is] the same from store to store," and that a finite list of tasks performed by members of the proposed class can be created. He contended that Sears Auto Centers "are operated as a chain store with a

---

[5] In or about February 2011, Sears instituted a new job position called "Service Supervisor." The record indicates this position was created to put more emphasis on the "back shop" part of the business, particularly because of the changes in the vehicles being serviced. Sears determined it needed to direct more expertise to that part of the business. Service Supervisors' duties include coaching the people who work in that area, and, if needed, helping with automotive work. The duties of the Service Supervisor previously had been performed by both Assistant Managers and Managers. Service Supervisors are classified as nonexempt employees.

centralized operation that places strict controls over design, layout, merchandising, pricing, staffing and day-to-day operations." Managers and Assistant Managers are required to use, and not deviate from, virtually identical "planograms" in designing the physical layout of each store, and to purchase products from the same vendors. Dailey alleged they also have little or no discretion as to selection or pricing of products or product vendors.

Dailey also submitted evidence that when setting work schedules for hourly employees, Managers and Assistant Managers are required to adhere to a computer-generated "Manpower Planner" that sets the labor budget for each store based on its sales trends. He contends that Managers and Assistant Managers are informed they have to remain within the allocated hours set by the Manpower Planner. Dailey further alleges that this required adherence to a strict labor schedule results in a shortage of hourly employee labor, which in turn forces the Managers and Assistant Managers to complete the tasks of those employees themselves.

Finally, Dailey argued that Sears keeps no records of the hours actually worked or the tasks performed by Managers and Assistant Managers, and provides no training to educate proposed class members as to the difference between exempt and nonexempt work. Sears has a policy, however, that Managers and Assistant Managers work a minimum of 50 hours per week or "until the job is complete."

In contrast, Sears argued that the day-to-day tasks of the Manager and Assistant Manager vary greatly from day to day and from store to store. These variations are driven by such factors as the store's location and customer base, its sales volume, the season, the day of the week, whether there is only one manager on duty, the level of experience of other store employees, and different management styles and preferences. Tasks performed in one location may not be performed in another. For example, some Managers and Assistant Managers may work on vehicles, others may not or may do so only rarely. Some may create work schedules in one auto center, but not at others. Because of the wide variation in actual job duties, Sears argued, it is not possible to formulate a finite list of tasks that all Managers and Assistant Managers, respectively, perform. Sears also maintained there is no minimum 50-hour-per-week requirement for proposed class members; instead, they have the discretion to tailor their own work schedule, as well as their employees' schedules, as they deem necessary to meet the needs of the auto center.

Sears also disputed Dailey's contention that Managers and Assistant Managers lack discretion to manage their auto centers as they see fit. Sears presented evidence that the proposed class members routinely make their own

decisions regarding changes to displays and pricing, setting work schedules, hiring and firing employees, and creating and implementing marketing and sales strategies. Sears contended the Manpower Planner highlighted by Dailey sets guidelines for allocating hours, but Managers and Assistant Managers have the discretion to deviate from those guidelines based on their experience and their assessment of business needs, and such deviations generally are approved.

## F. *The Trial Court's Order*

Prior to the October 28, 2011 hearing on the parties' respective motions, the trial court issued a brief tentative ruling granting Sears's motion to preclude class certification (but rejecting its collateral estoppel argument) and denying Dailey's motion for class certification. The trial court found that certification was "inappropriate" for three reasons: "(1) the individual facts and issues unique to each member of the alleged class and requiring separate adjudication are more numerous and significant than the common issues; (2) it is not impracticable to bring all interested potential claimants before the Court to assert their individual claims; and (3) the class representative is not adequate because Sears alleges that the class representative committed resume fraud when he misrepresented to Sears that he had 20 years of managerial experience while he allegedly had none. Questions about Dailey's credibility prevent him from being a proper class representative." The trial court's order included no further analysis of these issues. After hearing oral argument, the trial court adopted its tentative ruling.

### III

### DISCUSSION

## A. *The Trial Court Adequately Stated the Reasons for Its Ruling*

Dailey first contends the trial court failed to sufficiently explain its reasons for denying class certification. Of the three grounds stated for its ruling, the trial court provided factual detail only as to the third, regarding Dailey's suitability as class representative. Both the court's finding that individual issues predominate, and its conclusion that it is not impracticable to bring all individual claims before the court, are stated in more general language. As a result of this lack of detail, Dailey argues, this court cannot determine whether the trial court relied on inappropriate criteria or made incorrect assumptions in finding that common issues do not predominate, and that class treatment is not a superior method for resolving plaintiff's claims.

Unlike other appeals, where we review the trial court's ruling, not its reasoning (see, e.g., *People v. Geier* (2007) 41 Cal.4th 555, 582 [61

Cal.Rptr.3d 580, 161 P.3d 104]), in reviewing a denial of class certification, "we consider only the reasons given by the trial court for the denial, and ignore any other grounds that might support denial" (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1447 [19 Cal.Rptr.3d 508]). Accordingly, "when denying class certification, the trial court must state its reasons." (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939 [124 Cal.Rptr.3d 565].)

On the other hand, the law does not demand great detail from the trial court. (See, e.g., *Osborne v. Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 652, fn. 1 [243 Cal.Rptr. 815] [specific findings on each of the class certification criteria are not required].) Indeed, California courts have held that even if the trial court's order on class certification does not state reasons, or does so without providing detail, it will be deemed sufficient for review purposes so long as the basis for the court's ruling may be discerned from the record. (See, e.g., *Grogan-Beall v. Ferdinand Roten Galleries, Inc.* (1982) 133 Cal.App.3d 969, 976 [184 Cal.Rptr. 411] [noting that it was "clear from the record" the certification dispute turned on the issue of commonality of interest].) In *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440 [56 Cal.Rptr.3d 534] (*Walsh*), the appellants similarly complained that the trial court did not identify the reasons underlying its finding of lack of commonality. (*Id.* at p. 1452.) The appellate court rejected this argument. Although "the trial court did not explain at length why it concluded there was a lack of commonality," it did refer to the different circumstances of the class members' employment and stated its finding that common issues of fact and law did not predominate. (*Id.* at pp. 1452–1453.) The court also indicated that it had reviewed the parties' submissions and had " 'heard and considered the oral arguments of counsel,' " which had focused on the issue of commonality. (*Id.* at p. 1453.) Because "the trial court's reasoning [was] discernable from the court's statements and context," reversal of the order for lack of detail was not mandated. (*Id.* at p. 1453, fn. 7.)

The trial court's order in this case is indeed succinct. We conclude, however, that the lack of a detailed explanation for two of the court's three findings does not preclude meaningful review. First, the trial court *did* state its reasons, i.e., the predominance of individual issues and the ability to bring individual claims before the court. Second, as in *Walsh*, the record here provides assurance the trial court considered all the submissions and arguments of counsel. For example, the court's order includes rulings on each of Sears's evidentiary objections, and also notes that the court had heard oral argument. The order also cites appropriate legal principles relevant to the predominance and superiority analysis. Finally, the parties' briefs as well as oral argument focused on those issues. Indeed, the briefs and arguments of the parties emphasized to the court the certification issue of greatest concern

to Dailey, namely, whether plaintiff's theory of recovery is amenable to class treatment (defense counsel conceded this was an "overarching issue").[6]

To be sure, a more detailed explanation of the basis for a class certification ruling generally is desirable. The law, however, does not require any particular level of detail. We conclude the trial court's order, elucidated by the parties' briefing and oral arguments, is sufficient to permit meaningful appellate review in this case.

## B. *The Trial Court Did Not Abuse Its Discretion in Denying Class Certification*

### 1. *Governing Legal Principles and Standard of Review*

■ We now turn to the central issue in this appeal—the propriety of the trial court's denial of class certification. California courts have long viewed class actions as " 'serv[ing] an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitive litigation and provides small claimants with a method of obtaining redress . . . .' " (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469 [174 Cal.Rptr. 515, 629 P.2d 23]; see *Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1500 [57 Cal.Rptr.3d 903] (*Seastrom*).) This state's public policy supports the use of class actions to enforce California's minimum wage and overtime laws for the benefit of workers. (See *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*); *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 [76 Cal.Rptr.3d 804].) However, "because group action . . . has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*); see *Seastrom*, at p. 1500.)

---

[6] We find unpersuasive Dailey's contention that *Walsh* is distinguishable because the trial court there provided "some factual explanation for its finding," while the trial court here provided none. The *Walsh* trial court's statements that the class members' " 'circumstances of . . . employment' " differ greatly and that " 'individual hearings on both liability and damages are required . . .' " (*Walsh, supra*, 148 Cal.App.4th at pp. 1452–1453), are substantively no more detailed than the trial court's finding here that "individual facts and issues unique to each member of the alleged class and requiring separate adjudication are more numerous and significant than the common issues." Dailey fails to explain why his own arguments and those of Sears as set forth in the briefs and oral arguments do not provide a sufficient context from which to derive the basis for the court's findings, just as the briefing and argument in *Walsh* provided enough context for review of the trial court's order in that case.

"Section 382 of the Code of Civil Procedure authorizes class suits in California when 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' " (*Linder, supra*, 23 Cal.4th at p. 435; see *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 [139 Cal.Rptr.3d 315, 273 P.3d 513] (*Brinker*).) "Class certification requires proof (1) of a sufficiently numerous, ascertainable class, (2) of a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods." (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 [56 Cal.Rptr.3d 861, 155 P.3d 268] (*Fireside Bank*).) "The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members." (*Sav-On, supra*, 34 Cal.4th at p. 326.) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Ibid.*)

■ On the issue of whether common issues predominate in the litigation, a court must "examine the plaintiff's theory of recovery" and "assess the nature of the legal and factual disputes likely to be presented." (*Brinker, supra*, 53 Cal.4th at p. 1025.) The court may consider the elements of the claims and defenses, but should not rule on the merits unless necessary to resolve the certification issues. (*Ibid.*; *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106 [131 Cal.Rptr.2d 1, 63 P.3d 913]; *Linder, supra*, 23 Cal.4th at pp. 439–440.) "The 'ultimate question' . . . is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker*, at p. 1021.) " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Id.* at p. 1022.)

Trial courts " 'are ideally situated to evaluate the efficiencies and practicalities of permitting group action' " and therefore are " 'afforded great discretion' " in evaluating the relevant factors and in ruling on a class certification motion. (*Sav-On, supra*, 34 Cal.4th at p. 326; accord, *Brinker, supra*, 53 Cal.4th at p. 1022.) A " 'trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]" [citation]. . . .' " (*Sav-On*, at pp. 326–327.) In determining whether the record contains substantial evidence supporting the ruling, a reviewing court does not reweigh the evidence and must draw all reasonable inferences supporting the court's order. (*Id.* at p. 328.)

## 2. The Absence of Predominant Common Questions as to the Overtime Claims

### a. The trial court did not engage in an improper merits inquiry when it evaluated the parties' conflicting evidence.

■ The core dispute presented in this lawsuit and framed by both parties' pleadings and evidence is whether auto center Managers and Assistant Managers are properly classified as exempt employees. Resolution of this dispute will require proof at trial not only of Sears's expectations regarding how its managerial employees perform their duties, as expressed in its job descriptions and operational policies and procedures, but also of how these policies and procedures actually impact the potential class—i.e., whether proposed class members in fact engage primarily in nonexempt activities. (See *Walsh, supra*, 148 Cal.App.4th at p. 1461 [liability under the overtime laws is not established merely because the employer "classifies employees without regard to the law or investigating what work they do, . . . if the employees were, in fact, subject to the exemption"]; see also *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 802 [85 Cal.Rptr.2d 844, 978 P.2d 2] (*Ramirez*) [in determining proper classification of employee, court should "consider, first and foremost, how the employee actually spends his or her time"].) For class certification purposes, then, Dailey was required to present substantial evidence that proving *both* the existence of Sears's uniform policies and practices *and* the alleged illegal effects of Sears's conduct could be accomplished efficiently and manageably within a class setting. (See *Sotelo v. Medianews Group, Inc.* (2012) 207 Cal.App.4th 639, 654 [143 Cal.Rptr.3d 293] (*Sotelo*) ["A class . . . may establish liability by proving a *uniform* policy or practice by the employer that *has the effect on the group* of making it likely that group members will work overtime hours without overtime pay, or to miss rest/meal breaks." (italics added)].)

Dailey contends he presented such evidence, in the form of proposed class member declarations and deposition testimony showing that Sears's alleged business policies and practices, including standardized operations, the CEM role, the Manpower Planner, and a minimum 50-hour workweek, cause auto center Managers and Assistant Managers to spend the majority of their time on nonexempt tasks. Relying largely on the Supreme Court's analysis in *Sav-On*, Dailey argued that certification in this case is appropriate because Sears's uniform policies and practices resulted in a classwide erroneous exempt classification, and any individual questions regarding the correctness of that classification as to each Manager and Assistant Manager, and how much time each may have spent on nonexempt activities, could be resolved in an efficient manner at trial. (See *Sav-On, supra*, 34 Cal.4th at p. 338 [it is not necessary for class certification purposes that plaintiff demonstrate the misclassification theory is "either 'right as to all members of the class or wrong

as to all members of the class' "]; see also *id.* at pp. 333, 335 [certification not inappropriate merely because of variations in the mix of work or in damages].) Sears, not conceding the existence of common evidence that could prove liability as to the entire proposed class, submitted its own evidence disputing Dailey's characterization of the policies and practices at issue, and argued that whether it misclassified Managers and Assistant Managers required individual inquiries as to how each employee actually spends his or her time. (See, e.g., *Ramirez, supra,* 20 Cal.4th at p. 802 [court should inquire into the *"realistic* requirements of the job," including, "first and foremost, how the employee actually spends his or her time"].) The trial court apparently agreed with Sears, finding that "the individual facts and issues unique to each member of the alleged class and requiring separate adjudication are more numerous and significant than the common issues."

On appeal, Dailey principally contends that the trial court employed improper criteria in finding a lack of commonality, arguing the trial court erroneously "focused on the merits" of the parties' "conflicting testimony regarding potential variances in the job duties of [Managers and Assistant Managers]," instead of inquiring whether Dailey, pursuant to his theory of Sears's liability, "put forth substantial evidence of uniform policies and procedures that, if proven at trial, would establish, on a class-wide basis, the misclassification of [Managers and Assistant Managers]." Dailey argues that it was not necessary for him to prove at the class certification stage that these uniform policies and procedures "actually existed," but only that *"if* [they] existed, then establishing liability on a classwide basis was manageable." (Italics added.)

■ Dailey is correct that the validity of the complaint's allegations generally is not at issue on class certification. (*Sav-On, supra,* 34 Cal.4th at p. 326 [the certification question "is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious' "]; see *Brinker, supra,* 53 Cal.4th at p. 1023 ["resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided"].) By the same token, however, the focus of the class certification inquiry is on "the nature of the legal and factual disputes likely to be presented" (*Brinker,* at p. 1025), as those disputes are framed not only ·by the complaint but also by defendant's answer and affirmative defenses. (See *Fireside Bank, supra,* 40 Cal.4th at p. 1092 [trial court may consider how "various claims and defenses relate and may affect the course of the litigation"]; see also *Walsh, supra,* 148 Cal.App.4th at p. 1450 [court must consider not only the plaintiff's theory of liability but also the affirmative defenses of the defendant].) That inquiry, as the California Supreme Court has long recognized, frequently will be "enmeshed" with "issues affecting the merits of a case." (*Linder, supra,* 23 Cal.4th at p. 443.) "When evidence or legal issues germane to the certification question bear as well on aspects of

the merits, a court may properly evaluate them." (*Brinker*, at pp. 1023–1024.) In particular, "whether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits." (*Id.* at p. 1024.) That is because a court must determine "whether the elements necessary to establish liability are susceptible of common proof." (*Ibid.*)

Critically, if the parties' evidence is conflicting on the issue of whether common or individual questions predominate (as it often is and as it was here), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met—and doing so is not, contrary to Dailey's apparent view, an improper evaluation of the merits of the case. (*Sav-On, supra*, 34 Cal.4th at pp. 328, 331; see *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 508–509 [124 Cal.Rptr.3d 535] (*Mora*) [it is within trial court's discretion to credit defendant's evidence over plaintiff's].) For example, the Supreme Court in *Sav-On* concluded that the record in that case contained "substantial, *if disputed*, evidence that deliberate misclassification was defendant's policy and practice. The record also contain[ed] substantial evidence that, owing in part to operational standardization . . . , classification based on job descriptions alone resulted in widespread de facto misclassification." (*Sav-On*, at p. 329, italics added.) The court acknowledged that the defendant disputed the plaintiff's misclassification theories and presented its own evidence that those theories could not be proved on a classwide basis because how class members spent their time varied significantly from manager to manager. (*Id.* at p. 331.) *"But the trial court was within its discretion to credit plaintiffs' evidence on these points over defendant's . . . ."* (*Ibid.*, italics added.) The court emphasized that "[t]he trial court was not deciding—nor are we—the merits of plaintiffs' case." (*Ibid.*) Rather, it was merely recognizing that plaintiffs had established they likely could prove with evidence common to the class that "misclassification was the rule rather than the exception . . . ." (*Id.* at p. 330.)

We see nothing inappropriate in the trial court's examination of the parties' substantially conflicting evidence of Sears's business policies and practices and the impact those policies and practices had on the proposed class members. Neither the court's order nor the class certification hearing transcript indicates the trial court improperly focused on the validity of Dailey's allegations, and Dailey identifies nothing in the record suggesting otherwise. We therefore infer the trial court, as in *Sav-On*, weighed the parties' conflicting evidence for the sole, entirely proper, purpose of determining whether the record sufficiently supported the existence of predominant common issues provable with classwide evidence, such that " 'the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Sav-On, supra*, 34 Cal.4th at p. 326.) In determining the record did not support class certification, the trial court appears to have credited

Sears's evidence indicating that highly individualized inquiries would dominate resolution of the key issues in this case. Under the foregoing authorities, it was acting within its discretion in doing so.

    b.   *Substantial evidence supports the trial court's finding that common questions do not predominate.*

Having established that the trial court was permitted, in its discretion, to credit Sears's evidence over Dailey's in finding a lack of commonality, we must now consider whether that evidence is substantial, and thus sufficient, to support the trial court's ruling. (*Sav-On, supra,* 34 Cal.4th at pp. 326–327 [a certification ruling must be supported by substantial evidence]; accord, *Brinker, supra,* 53 Cal.4th at p. 1022.) Dailey argues it is not. We disagree.

Initially, we observe that in his briefs on appeal, Dailey seems to focus less on whether Sears's evidence is substantial than on whether his own evidence satisfies that standard. This misconstrues the function of this court. Our role on this appeal is narrowly confined to examining whether the trial court's ruling is supported by substantial evidence, and if it is, we may not substitute our own judgment for that of the trial court. (*Sav-On, supra,* 34 Cal.4th at pp. 326–327, 331.) To affirm the certification order, we "need not conclude that [Sears's] evidence is compelling, or even that the trial court would have abused its discretion if it had credited [Dailey's] evidence instead." (*Id.* at p. 331; see *Mora, supra,* 194 Cal.App.4th at p. 508 [observing that had the trial court accepted plaintiffs' evidence, "class certification would certainly have been proper"].) "[I]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925], italics omitted.) Accordingly, we do not ask on this appeal whether Dailey's evidence may have been sufficient to support class certification, but confine our analysis to whether the record contains substantial evidence supporting the trial court's conclusion that "individual facts and issues . . . requiring separate adjudication are more numerous and significant than the common issues."

As noted, Dailey's principal theory of liability is that Sears implemented uniform policies and practices that resulted in the classwide misclassification of Managers and Assistant Managers as exempt employees. Sears presented substantial evidence, including the declarations and/or deposition testimony of 21 proposed class members and six corporate managers or other personnel, that the policies and practices identified by Dailey either do not exist, or if they do, they do not have the alleged uniform, illegal effect of requiring Managers and Assistant Managers to engage primarily in nonexempt work.

For example, Dailey alleges Sears uses the Manpower Planner—a computer-generated document created at the corporate level—to set labor budgets and schedule the staffing of each store, and Managers and Assistant Managers have no discretion to diverge from it. For this reason, Dailey argues, when there is a shortage of hourly labor, the Managers and Assistant Managers must fulfill the roles of their nonexempt employees. Sears's evidence, however, indicated this is not the case. Thus, district manager James Nguyen, while urging employees to "[s]tick to your manpower," also testified that he can and does allocate additional hours to an auto center at the request of a Manager. Michael Pettengill, a district auto center manager, similarly testified that the Manpower Planner is "a tool to assist the stores with scheduling and staffing," but that he is approached "[o]n a regular basis" by Managers and Assistant Managers requesting additional manpower hours, and he approves all but about 10 percent of the adjustments. Many of the proposed class member declarants averred that they are not bound by the labor budgets, and/or that they may request, and usually will receive, adjustments if they are needed.

This evidence indicates that, even if Sears's expectation is that the Manpower Planner will be followed, class members are able to adjust it as necessary. Logically, this evidence tends to undermine Dailey's categorical assertion that the Manpower Planner is responsible for shortages of hourly employees at auto centers, and thus, for proposed class members having to perform nonexempt tasks on a routine basis. Indeed, although Dailey stated in his declaration that he frequently experienced labor shortages and had no way of obtaining additional "desperately needed" hours, Pettengill averred that when he visited Dailey's auto center, he observed that Dailey was not even using his full allotment of labor hours, and Pettengill urged him to do so. Based on this evidence, the trial court reasonably could conclude that plaintiff's theory—that use of the Manpower Planner leads to labor shortages that force class members regularly to spend much of their time on nonexempt tasks—could not be proven with evidence common to the class, but would have to be established through individualized examination of each auto center and each proposed class member's experiences. (See *Mora, supra,* 194 Cal.App.4th at p. 512 [trial court "could properly conclude there was insufficient evidence of a uniform corporate policy requiring store managers to engage primarily in nonmanagerial duties and, therefore, the theory of recovery was not amenable to common proof"].)

Similarly, Sears challenged Dailey's allegations regarding the company's alleged standardization of auto center operations and a mandated 50-hour workweek. Dailey presented evidence of corporate-generated planograms for the design and layout of stores, as well as evidence that stores use common vendors and that class members have no discretion to adjust store design,

product selection or prices. But Sears's evidence presented a different scenario, one in which class members can diverge from the planograms, and can and do make their own decisions about displays and pricing. Sears noted that although class members do not set the initial prices of products, they are empowered to authorize discounts to match the competition, resolve customer complaints and expedite the sale of clearance items. Additionally, Sears presented evidence that products varied from store to store, and thus, the planograms necessarily varied.

Sears also disputed the existence of a mandated 50-hour workweek. Sears's witnesses stated they have the discretion to set their own schedules as well as those of other employees. They averred they work anywhere from 40 to 60 hours per week. When asked at his deposition whether there is an expectation that Managers and Assistant Managers work a minimum of 50 hours, district manager Pettengill responded simply, "No." Sears also presented evidence that Managers and Assistant Managers use their own discretion and independent judgment in hiring, disciplining and firing employees, and that their decisions are virtually never overruled.

Finally, Dailey places particular emphasis on Sears's creation of the CEM role, arguing the evidence shows that Sears requires Managers and Assistant Managers to spend over 50 percent of their time acting as the CEM, and that Sears designed that role to include mostly "hourly associate work."[7] Sears's evidence, again, paints a different picture. Although the testimony of Sears's proposed class members, like that of Dailey's declarants, indicates the CEM duties occupy a substantial part of the day-to-day work of Managers and Assistant Managers, the parties fundamentally disagree on what those duties are. Dailey's declarants state that as CEM they engage primarily in nonexempt work, such as driving vehicles into the bays for service, gathering parts and performing mechanical work. In contrast, the Sears declarants describe

---

[7] Dailey states, without any further argument or explanation, that the CEM role was created when Sears, "in an effort to reduce payroll costs," eliminated the nonexempt "Service Manager" position and replaced it with the CEM role to be performed by exempt Managers and Assistant Managers. Dailey appears to suggest that Managers and Assistant Managers are misclassified because they now perform the nonexempt work formerly done by Service Managers. The record citations Dailey provides do not support this assertion. Similarly, Dailey suggests, without explicitly so arguing, that because the job duties of the nonexempt Service Supervisors were once performed by Assistant Managers, Assistant Managers are misclassified as exempt employees. Again, however, the record pages Dailey references do not support such a broad assertion. Because Dailey fails to support these contentions with appropriate argument and citations, we will not consider them further. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [124 Cal.Rptr.3d 78] [" ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "]; *EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 775 [75 Cal.Rptr.3d 902] [issue deemed waived where it is unsupported "by way of argument, discussion, analysis, or citation to the record"].)

the CEM's role as a managerial one, involving communicating, coaching and controlling the workflow in the auto center, and ensuring that work is allocated and completed in an efficient and timely manner. As one Assistant Manager, Rey Castro, described it: "[T]he CEM role is important because it is the process in which I oversee and direct the work of the associates on an ongoing, daily basis to ensure a high level of service and making sure we get the work done right and done on time, which increases the store's overall profitability."

Sears's declarations do reveal that, whether acting in the CEM role or otherwise, Managers and Assistant Managers to some extent perform functions normally assigned to hourly, nonexempt employees, such as customer service, sales, inventory work and mechanical work. However, in contrast to Dailey's witnesses, who state that Managers and Assistant Managers routinely spend 75 to 90 percent of their time performing typical nonexempt work, Sears's declarants aver they spend anywhere from 1 to 40 percent of their time on nonmanagerial, nonexempt tasks.

Relying again on *Sav-On*, Dailey argues that the conflicts in the parties' submissions as to how much time proposed class members spend on what tasks, and whether those tasks are managerial and exempt, or nonmanagerial and nonexempt, do not preclude class certification, because a reasonably definite and finite list of tasks performed by Managers and Assistant Managers could be developed. In *Sav-On*, the Supreme Court observed that the predominant issue in that case appeared to be "how the various tasks in which [class members] actually engaged should be classified—as exempt or nonexempt." (*Sav-On, supra*, 34 Cal.4th at p. 330.) That issue could be resolved in a class setting because "both defendant's and plaintiffs' submissions comprise[d] a reasonably definite and finite list" of the tasks performed by class members. (*Id.* at p. 331.)

Dailey's attempt to fit this case into the *Sav-On* mold fails, for two reasons. First, as the foregoing discussion demonstrates, the parties' dispute in this case is not focused on whether the various duties of Managers and Assistant Managers are properly characterized as exempt or nonexempt, but on whether Sears has *implemented policies and practices* that *cause* these employees to spend most of their time engaging in nonexempt work.[8] Second, the parties

---

[8] In fact, a comparison of Dailey's and Sears's submissions reveals that both parties' declarants generally understand "nonexempt" work to include such tasks as ringing up sales, working on vehicles, inventory, or picking up product, and "exempt" work to include evaluating, coaching or disciplining employees, recruitment and hiring, creating work schedules, managing the workflow, participating in management calls, and analyzing financial data.

Presumably to buttress his contention that Sears likely would only dispute at trial the proper characterization of the work done by proposed class members, Dailey states, without elaboration, that Sears considers *all* the work performed by the proposed class members to be "managerial work." Some of Sears's witnesses in fact testified they consider all the work they

here pointedly *did* not agree that a "reasonably definite and finite list" of tasks performed by *all* Managers and Assistant Managers could be created. Patrick Boylan, Sears's "person most knowledgeable" witness, testified that he "wouldn't be comfortable saying you could come up with a finite or conclusive list of every single thing that [proposed class members] do." Other corporate witnesses emphasized the difficulty in creating such a list due to wide variations in duties day to day. Some of Sears's proposed class member declarants testified that they could create a list of their *own* duties. But a number of those who said they could create such a list also noted it would not be a straightforward process, nor would such a list necessarily be complete, because of day-to-day variations in tasks. An Assistant Manager, Joe Duitsman, testified that he "would not be able to make a list of all my job duties on a daily or even a weekly basis because my tasks vary from day to day, season to season, and are based on the location of the auto center, sales volume, supervisor, staffing levels, whether I have another manager, [and] the experience of that manager, among other factors."

Substantial evidence is evidence that "is not 'qualified, tentative and conclusionary' [citation] but, rather, ' "of ponderable legal significance . . . reasonable in nature, credible, and of solid value." ' " (*Sav-On, supra,* 34 Cal.4th at p. 329.) The evidence submitted by Sears regarding its business policies and practices and how they impact the job duties of auto center Managers and Assistant Managers falls within this description, because, like Dailey's, it consists principally of sworn declarations and deposition testimony. (*Ibid.* [noting that plaintiffs' substantial evidence included depositions, declarations and documents].) Dailey does not argue otherwise.

■ Furthermore, Sears's evidence undermines the essential premise of Dailey's motion for class certification, namely, that Sears's liability could be established with common evidence because Sears's allegedly uniform business practices had the same impact on Managers and Assistant Managers classwide. Based on Sears's evidence, the trial court reasonably could infer not only that the proposed class members have flexibility in applying the allegedly "uniform" policies and practices in their stores, but also that the day-to-day tasks of Managers and Assistant Managers, rather than being

---

perform as Managers or Assistant Managers (even such tasks as working with vehicles) to be part of their managerial duties. When these statements are viewed in context, however, it may reasonably be inferred they are merely acknowledgements that the one responsible for the financial success of a store is likely to believe everything he or she does is part of his or her job as a manager. Saying a task is "managerial" is not necessarily the same as saying every task performed is "exempt" within the meaning of the overtime laws. As noted above, Sears's witnesses appear to recognize the difference between exempt and nonexempt work.

uniformly dictated by these few policies and practices, vary greatly depending on a number of factors, ranging from the store's location to particular management styles and preferences.

Whether the trial court could have properly certified a class based on Dailey's conflicting evidence of centralized behavior on the part of Sears toward its auto center Managers and Assistant Managers, with the resulting classwide effect of misclassification, is not the inquiry before this court. In light of Sears's substantial evidence disputing the uniform application of its business policies and practices, and showing a wide variation in proposed class members' job duties, the trial court was acting within its discretion in finding that plaintiff's theory of Sears's liability was not susceptible of common proof at trial. (*Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 734 [108 Cal.Rptr.3d 15] [trial court did not err in crediting defendants' evidence over plaintiffs' when it concluded that "managers' duties and time spent on individual tasks varied widely from one restaurant to another"].) On appeal, "we have no authority to substitute our own judgment for the trial court's respecting this or any other conflict in the evidence." (*Sav-On, supra,* 34 Cal.4th at p. 331.)

> c. *Dailey's proposed sampling methodology does not cure the*
> *deficiencies of his evidentiary showing.*

Dailey contends that, even assuming the presence of individual issues requiring adjudication, the trial court should have considered the random sampling methodology proposed by his expert, Dr. Drogin, as a means of managing those individual questions in a class action setting. (See *Sav-On, supra,* 34 Cal.4th at p. 339 [" 'the trial court has an obligation to consider the use of . . . innovative procedural tools proposed by a party to certify a manageable class . . .' "]; see also *Brinker, supra,* 53 Cal.4th at p. 1024 [trial court "must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence"].) The trial court did not expressly address Dr. Drogin's proposal in its order. However, "[p]resuming in favor of the certification order, as we must, the existence of every fact the trial court could reasonably deduce from the record" (*Sav-On,* at p. 329), we cannot say it would have been irrational for the trial court to reject the use of Dr. Drogin's proposed sampling methodology in view of its conclusion that individual issues predominate in this case.

Dr. Drogin proposed that the trial court use his sampling methodology to prove both liability *and* damages in this case.[9] The latter use generally has found wide acceptance. (See, e.g., *Sav-On, supra,* 34 Cal.4th at p. 333 [noting that use of statistical sampling in an overtime class action " 'offers a different method of proof' " of damages]; 3 Newberg on Class Actions (4th ed. 2002) § 10.3, pp. 479–482 [aggregate class proof of monetary relief may be based on sampling techniques, among others].) Employing random sampling to prove liability is more controversial.[10] However, we need not delve too deeply into this controversy here. Even assuming representative or statistical sampling may be used to prove liability on a classwide basis in an appropriate overtime-pay class action, this is not that action.

To obtain class certification, Dailey was required to demonstrate the predominance of common questions of law or fact. (*Sav-On, supra,* 34 Cal.4th at p. 326.) As we have explained, the record supports the trial court's finding that Dailey failed to satisfy this requirement. We have found no case, and Dailey has cited none, where a court has deemed a mere proposal for statistical sampling to be an adequate evidentiary *substitute* for demonstrating the requisite commonality, or suggested that statistical sampling may be used to manufacture predominate common issues where the factual record indicates none exist. If the commonality requirement could be satisfied merely on the basis of a sampling methodology proposal such as the one before us, it is hard to imagine that any proposed class action would *not* be certified.

■ That cannot be what the Supreme Court envisioned in *Sav-On* when it urged courts to consider the use of " 'innovative procedural tools' " to manage any individual issues. (*Sav-On, supra,* 34 Cal.4th at p. 339.) On the contrary, courts have held that when the class action proponent fails to satisfy the threshold requirement of commonality, as occurred here, the trial court

---

[9] In his declaration, Dr. Drogin described a procedure whereby a random, representative sample of proposed class members would be deposed regarding the duties they performed to determine whether they were properly classified as exempt. This information could then be projected to the proposed class as a whole, to determine Sears's liability, and thereafter, could be used to determine damages.

[10] The United States Supreme Court expressed its doubts on this issue in the employment discrimination context in *Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. ___ [180 L.Ed.2d 374, 131 S.Ct. 2541], concluding that representative sampling studies showing employment disparities at the national or regional level did not "establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends." (*Wal-Mart,* at p. ___ [180 L.Ed.2d at p. 394, 131 S.Ct. at p. 2555].) Whether the use of sampling methodologies to prove liability in a case challenging employees' exempt classification is consistent with due process is now before the California Supreme Court in *Duran v. U.S. Bank National Assn.* (May 16, 2012, S200923), granting review of *Duran v. U.S. Bank National Assn.* (2012) 203 Cal.App.4th 212 [137 Cal.Rptr.3d 391]. Interestingly, Dr. Drogin developed one of the methodologies at issue in *Wal-Mart* (see *Wal-Mart,* at p. ___ [180 L.Ed.2d at p. 393, 131 S.Ct. at p. 2555]), and in this case, highlighted *Duran* as a case in which his methodology had previously been used with success.

does not err in rejecting the use of statistical sampling or other methodologies to establish liability as to the whole proposed class. (See, e.g., *Mora, supra,* 194 Cal.App.4th at pp. 501, 509–510 [rejecting argument that trial court erred in failing to consider survey methodology proposed by plaintiffs' expert to measure the amount of time employees spent on exempt versus nonexempt tasks, in light of that court's reasonable conclusion that common questions of fact or law did not predominate over individual ones]; *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1432 [47 Cal.Rptr.3d 83] (*Dunbar*) [no error in court's conclusion—and in its implicit rejection of the use of surveys and exemplar evidence—that the "findings as to one grocery manager could not reasonably be extrapolated to others given the variation in their work"].)

Dailey correctly points out that in *Sav-On,* the Supreme Court noted approvingly that a number of courts have considered sampling evidence and other "indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate." (*Sav-On, supra,* 34 Cal.4th at p. 333; see cases cited *id.,* at fn. 6.) For example, in a gender discrimination case cited by the *Sav-On* court, *Stephens v. Montgomery Ward* (1987) 193 Cal.App.3d 411 [238 Cal.Rptr. 602], the plaintiff demonstrated the existence of predominant common questions, in part, with statistical data showing that each store's "hiring and promotional practices, whatever they may be, have manifested themselves in the same general fashion" located in the area in question. (*Id.* at p. 421.) This data, together with other evidence, was sufficient "to show women were subjected to company-wide policies and practices which affected all within the proposed class." (*Ibid.*)

Here, however, Dr. Drogin did not offer any *actual data* evidencing that Sears conducts itself in a common way toward all the proposed class members, or that its policies and practices tend to have a widespread illegal effect on the classification of Managers and Assistant Managers. Dr. Drogin's sampling proposal is just that—a generic proposal not tied specifically to the facts of this case, or tailored to the evidence presented by the parties.[11] (See, e.g., *In re Wells Fargo Home Mortgage Overtime Pay Litigation* (N.D.Cal.

---

[11] In the face of Sears's evidence of wide variation in both the job duties and hours worked of the members of the proposed class, Dr. Drogin provided little assurance to the trial court that the proposed methodology would reliably measure the impacts of Sears's policies and practices on a *classwide* basis. Given Sears's evidence, much of the debate between the parties' respective experts concerned what sample size would be necessary to ensure reliable results. To address the concerns raised by Sears's expert, Dr. Drogin hypothesized that an initial random sample could be surveyed "in order to measure variation in the population," and then an "appropriate sample size" could be computed in a second sample, based presumably on the degree of variation found in the first. This is pure conjecture, of course, but it also begs the question whether the efficiency of proceeding as a class action would be compromised when multiple samples are required just to figure out what an appropriate sample size would be.

2010) 268 F.R.D. 604, 612, fn. 2 [court rejected proposed sampling methodology to establish whether class as a whole qualified for any overtime pay exemptions, and noted that its analysis might have been different had plaintiff included a statistical study in support of her motion]; *Mora, supra,* 194 Cal.App.4th at p. 510 [noting that, at time of class certification hearing, plaintiff's expert "had not yet conducted a survey"].) In essence, Dailey asked the trial court to certify the class based on little more than "abstract statements about what statistical sampling might be able to establish." (*Wells Fargo,* at p. 612, fn. 2; see *Mora,* at p. 510 [no error where expert's declaration "did nothing to refute the evidence presented by [the defendant] that it did not operate its stores or supervise its managers in a uniform and standardized manner"].) A trial court does not err in rejecting a proposed statistical sampling procedure when the class action proponent fails to "explain how the procedure will effectively manage the issues in question." (*Dunbar, supra,* 141 Cal.App.4th at p. 1432.)

### 3. *The Absence of Predominant Questions as to the Meal Period/Rest Break Claims*

Dailey also alleged that Sears "routinely interrupted and/or failed to permit, authorize and/or provide" the proposed class members with meal periods and rest breaks as required by law.[12] There is no substantial evidence, however, that Sears employed any policy or routine practice to deprive proposed class members of off-duty meal and rest breaks and, accordingly, Dailey failed to show that this allegation could be proved on a classwide basis.

In *Brinker,* the California Supreme Court clarified that an employer is required to make uninterrupted meal periods and rest breaks available, but is not obligated to ensure that they are taken. (*Brinker, supra,* 53 Cal.4th at pp. 1034, 1040–1041.) Additionally, an employer may be liable even when it makes rest and meal breaks available to nonexempt employees, if it also requires them to be available for work during those periods. (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1104 [56 Cal.Rptr.3d 880, 155 P.3d 284] [requirement to provide rest/meal periods implies that employee will "be free of the employer's control during the meal period"]; see also *Sotelo, supra,* 207 Cal.App.4th at p. 654 [a class may establish

---

[12] Dailey acknowledged that because California law requires an employer to provide uninterrupted meal periods and authorize and permit rest breaks only for nonexempt employees (see Lab. Code, § 226.7; Cal. Code Regs., tit. 8, art. 7, § 11070, subds. 1(A), 11, 12), his meal period and rest break claims are derivative of his claim that Sears deliberately misclassified Managers and Assistant Managers as exempt employees. Because Dailey's theory of liability regarding the proposed class members' alleged nonexempt status is not suitable for class treatment, it follows that his meal period/rest break claims also properly are not certified. However, even if Dailey's misclassification theory were amenable to class treatment, his meal period/rest break claims would not be, for the reasons we explain here.

liability "by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will . . . miss rest/meal breaks"].)

In the trial court, Dailey argued that Sears has no formal written policy regarding meals and rest breaks for its salaried employees at its auto centers, does not provide training on that subject to those employees, and does not keep track of whether those employees took their meal and rest breaks. Dailey cited the deposition testimony of several Sears corporate managers appearing to substantiate these assertions with respect to salaried managers, as opposed to hourly employees, for whom such policies apparently do exist. Dailey also submitted declarations from several proposed class members stating in identical language that they "did not regularly take an uninterrupted 30-minute meal period," were "never even told [they were] allowed a meal period," and were "never told that [they were] entitled to a 10-minute rest break."

These submissions provide no evidence of a policy or widespread practice of Sears to deprive nonexempt employees of uninterrupted meal periods and rest breaks. Nothing in Dailey's evidence indicates that Sears *prohibits* class members from taking uninterrupted meal and rest breaks, or that it has a uniform policy of *requiring* on-duty meal and rest breaks. Rather, the proposed class member declarations, at best, reveal that those individuals did not regularly take uninterrupted meal periods and personally were never told they were entitled to meals and rest breaks. Critically, these declarants do not aver that they are not free to take such breaks or that Sears *requires* them to be available for work during those periods.

Dailey cites the testimony of Larry Foerster, a "full-line" store manager, as evidence of Sears's uniform policy requiring Managers and Assistant Managers "to be accessible by phone to answer questions when taking a meal period or rest break." Dailey mischaracterizes Foerster's testimony, the thrust of which was that he and his auto center managers had the *ability* to contact each other by cell phone during breaks or meal periods. This testimony does not support the allegation that Sears *required* proposed class members to be available while on breaks—only that they could be reached if the need arose. Indeed, Foerster testified "there's no expectation" that Managers be available by telephone if questions come up during meal periods. When asked whether Managers are required to stay on the premises during meal periods, Foerster testified that his "expectation" is that a Manager on a break will "have time away . . . from the business of the day." For the same reason, Dailey's reliance on the testimony of Sears declarants who stated they *choose* to make themselves available during break periods by letting others know their whereabouts, is misplaced.

Dailey also is not helped by evidence that Sears does not have formal written policies regarding rest breaks and meal periods for salaried Managers, does not ensure that breaks are taken, and does not keep records of breaks these employees take. First, such evidence is consistent with Sears's contention that Managers and Assistant Managers are exempt employees. Second, to the extent this evidence relates to whether Managers and Assistant Managers actually take uninterrupted breaks, or to whether Sears enforces meal and rest periods, that evidence is not directly relevant after *Brinker*. (*Brinker, supra*, 53 Cal.4th at pp. 1034, 1040–1041.) Finally, the absence of a formal written policy explaining salaried Managers' rights to meal and rest periods does not necessarily imply the existence of a uniform policy or widespread practice of either depriving these employees of meal and rest periods or requiring them to work during those periods. Sears presented substantial evidence that no one prevents Managers and Assistant Managers from taking meal and rest breaks, and they are free to do so as they deem appropriate. As explained previously, the trial court was entitled to credit this testimony over contrary inferences suggested by Dailey's evidence. (See, e.g., *Sav-On, supra*, 34 Cal.4th at p. 331.)

Given the absence of substantial evidence of a uniform policy or widespread practice requiring on-duty rest breaks and meal periods, the trial court did not abuse its discretion in denying class treatment of those allegations.[13]

## C. *The Trial Court Did Not Err in Ruling on the Motion to Preclude Certification*

Dailey contends that the trial court should have denied Sears's motion to preclude class certification because it was addressed to a broader, statewide class that Dailey subsequently narrowed, in the SAC, to a San Diego district class. Dailey gives two reasons why the motion to preclude should have been deemed "moot." First, the evidence supporting the motion was "irrelevant" to the newly revised class definition. Second, if the trial court in fact granted the motion as to the original, but no longer applicable, statewide class, any such ruling would violate the due process rights of Managers and Assistant

---

[13] Given our conclusion here that Dailey failed to make the necessary showing of commonality as to his overtime pay and rest/meal break claims, it is not necessary for us to address the trial court's additional stated reasons for denying class certification, i.e., that a class action is not the superior method for resolving this dispute, and that Dailey is not a suitable class representative. In addition, because Dailey's remaining claims under Business and Professions Code section 17200, Labor Code section 226, subdivisions (a) and (e) (concerning Sears's failure to itemize wage statements), and the Labor Code Private Attorneys General Act of 2004, are all derivative of his main claims regarding failure to pay overtime wages and provide uninterrupted rest and meal periods, we need not address separately the suitability of those claims for class certification.

Managers outside the San Diego district. We do not agree the evidence submitted by Sears in connection with the motion to preclude was irrelevant to the revised class definition. Furthermore, despite the lack of explanatory detail in the trial court's order, we conclude that, when that order is viewed in context, Dailey's due process concerns are unwarranted.

In the first paragraph of its order, the trial court stated only that Dailey's motion for class certification was denied, and Sears's motion to preclude was "granted, although the Court does not accept Sears's collateral estoppel argument."[14] There is no further explicit mention of the motion to preclude. Rather, the balance of the trial court's order is addressed to propriety of class certification generally, and to the objections Sears lodged to Dailey's evidence submitted in support of his motion for class certification. Moreover, once the SAC was filed (without objection by Sears), Sears's briefing on its motion to preclude was limited to the suitability for certification of the proposed San Diego district class. Sears did not argue that the trial court should preclude certification of any class other than the one Dailey was then proposing. Although its brief on appeal does not specifically address the due process concerns raised by Dailey, Sears does not suggest that the trial court's order is so broad as to preclude any class beyond the San Diego district class. Accordingly, the context and sequence of events in this case leads us to conclude that the court's order denying class certification is limited to the proposed class then before the court, i.e., the San Diego district class.

Dailey's assertion that Sears's evidence on the motion to preclude is "irrelevant" to the revised, narrower class is disingenuous. Although the geographic scope of the class may have been limited, the issues relevant to the certification of the narrower class are the same as those for a statewide class. In fact, more than a quarter of the 56 declarations Sears lodged in support of its motion are from proposed members of the San Diego district class. Additionally, the testimony of Boylan, Sears's human resources manager for the southwest region, which includes the San Diego district, was equally pertinent to the narrower class proposed in Dailey's motion. Indeed, Dailey himself relied on Boylan's testimony, as well as the testimony of other Sears personnel above the district level, in urging the trial court to certify the class. In these circumstances, we discern no error in the trial court's refusal to deny the motion to preclude class certification as moot.

D.   *The Trial Court Was Within Its Discretion in Denying Dailey's Motion to Continue the Class Certification Hearing Date*

Finally, Dailey appeals the trial court's denial of his application for continuance of the class certification · hearing date. Dailey contends the

---

[14] Sears had argued that Dailey's action was collaterally estopped by virtue of the denial of class certification in the similar *Jimenez* action, in which Dailey was a proposed class member.

continuance was necessary to enable him to complete additional relevant discovery, including the depositions of several of Sears's proposed class member declarants, as well as of three corporate managers identified by another deponent as possessing relevant information. The trial court denied Dailey's request, finding that "there has been plenty of time for discovery to occur." We review the trial court's ruling denying the continuance for abuse of discretion. (See *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1126 [138 Cal.Rptr.3d 130] [decision to grant or deny continuance is committed to the sound discretion of the trial court]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 8:103, p. 8-63 (rev. # 1, 2012) [whether a particular hearing or trial should be postponed is subject to abuse of discretion review].)

This action was commenced in April 2009. Although formal discovery was stayed for about a year after Sears removed the case to federal court, Dailey still had about one and a half years in which to conduct unrestricted discovery before the October 2011 class certification hearing. Dailey does not dispute Sears's assertion that even while the case was stayed, nothing prevented him from contacting proposed class members and engaging in informal investigation or obtaining declarations. To be sure, Dailey did not know in advance whose declarations Sears would use in support of its motion to preclude certification. However, he was able to take four of the "seven or eight" proposed class member depositions he requested in advance of the hearing on the motions to certify and preclude certification. Dailey makes no effort to explain how the inability to depose an additional three proposed class members in any way prejudiced him or his ability to prepare his arguments in support of certification.

Dailey also insists that the testimony of the additional corporate personnel was relevant to the issues of employee classifications and labor budgets, but again, he fails to explain why the testimony of these particular individuals was *necessary* to the preparation of his class certification motion. On this record, we are not persuaded by Dailey's argument that he was diligent in the pursuit of this testimony. Sears contends the identities of relevant corporate witnesses were disclosed long before August 2011, when Dailey deposed Boylan, Sears's designated "person most knowledgeable" witness. Even though it became apparent at that deposition that Boylan was not knowledgeable on many relevant topics, Dailey did not demand that Sears promptly produce *all* persons knowledgeable on those topics. Instead, he noticed additional depositions based on Boylan's identification of others who might possess relevant information, and then, based on the testimony of those subsequent deponents, he requested the depositions of still other corporate personnel who might have relevant knowledge. By pursuing such a strategy, Dailey ran the risk that the October 2011 hearing date would arrive before he could complete all these depositions.

As it is, Dailey was able to depose all but the last three corporate managers, as well as some proposed class members. From the record, it appears that Dailey's inability to complete the requested depositions was at least as much the result of his own scheduling issues as it was of Sears's scheduling conflicts. We detect no undue foot-dragging or bad faith on Sears's part insofar as the unsuccessful effort to schedule these last-minute depositions is concerned.

■ It is not enough for Dailey to argue conclusorily that these additional depositions are relevant, and that he was diligent in pursuing them. The law requires not that the parties be able to conduct a comprehensive investigation, but rather, only that they have "a chance to conduct *reasonable* investigation" in advance of the class certification determination. (*Atari, Inc. v. Superior Court* (1985) 166 Cal.App.3d 867, 870 [212 Cal.Rptr. 773], italics added.) We conclude Dailey had sufficient time to conduct such a reasonable investigation. At a minimum, he was obliged to explain why the testimony of these additional witnesses was essential to his motion for class certification. Dailey did not make this showing. Accordingly, the trial court was within its discretion to deny the continuance.

## DISPOSITION

The judgment is affirmed. Respondent may recover its costs of appeal.

O'Rourke, Acting P. J., and Aaron, J., concurred.

On March 27, 2013, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 10, 2013, S210355.