Filed 2/13/19; certified for publication 3/12/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| ROGER MYERS et al., | C075125 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV112668) |
| v. | |
| RALEY'S, | |
| Defendant and Respondent. | |

Without the benefit of *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522 (*Ayala*) and *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986 (*Jones*), and without elucidating its reasons, the trial court denied Raley's maintenance technicians' motion for class certification of their wage and hour claims. The technicians allege Raley's maintains uniform policies and/or practices denying them travel time while they are under Raley's control, compensation for working during meal time, and reimbursement for personal tools they are required to purchase and replace. These uniform policies and practices, according to the technicians, present common issues of fact and law and their legality are particularly well suited to a class action. In denying

1

class certification, the trial court made the conclusory finding the plaintiffs failed to establish that a well-defined community of interest exists and that the common issues of fact and law predominate.

Our review of the trial court's denial of class certification is governed by a unique standard of review requiring us to examine the trial court's reasons, not the propriety of the outcome. Because the trial court's cursory finding renders our task impossible and because cases decided after the court's ruling expose the dangers of employing the wrong legal criteria, asking the wrong questions, or inflating the significance of the opposing parties' evidence, we must remand this case to the trial court for reconsideration in light of *Ayala* and *Jones* and for a statement of reasons to ensure the court has not employed improper criteria or relied on erroneous legal assumptions.

## FACTS

Plaintiffs Roger Myers, Dave Billings, Greg Neyhart, and Jim Mestas were nonexempt maintenance technicians for Raley's grocery stores. Maintenance technicians, including food equipment technicians, refrigeration technicians, and service and construction electricians, travel from store to store in company-owned vehicles to repair ovens, refrigeration units, electrical components, and other equipment. Plaintiffs sought certification of the class defined as: "All current and former hourly employees who held the position of Food Service Technician, Refrigeration Technician and/or Electrician Technician (and/or similar position) at Raley's in the State of California within four (4) years of the filing of the original complaint to the present ('the Class')."

**Uniform Policy or Practice Regarding Driving Time**

Plaintiffs allege they are required to drive company vehicles carrying their own tools as well as specialized tools and they are not allowed to run personal errands without special permission or carry passengers who are not Raley's employees except in an emergency. Despite Raley's control over their driving time, they are not compensated for

2

the time they spend driving to their first store or driving home from the last store they service each day. They assert Raley's uniform practice violates California law. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 583.)

Raley's identified Rob Canfield as the "person most knowledgeable" about the use of company vehicles. Canfield testified as follows:

"Q. So the vehicle policies are the same for all those groups of people [electricians, carpenters, refrigeration, flooring, food service, cabinet and warehouse]?

"A. Yes."

And:

"Q. Okay. Is it your testimony that pursuant to Raley's vehicle usage policy, vehicles are not to be used for personal use?

"A. Yes.

"Q. Okay. Is it your testimony that pursuant to Raley's vehicle usage policy, technicians are not to use the company vehicle to run personal errands? [¶] . . . [¶]

"[A.] I can answer. Yes. They are not to use the vehicle for their own personal use."

He also testified:

"Q. So when they get in their vehicle to drive to their first job, they are not to use the company vehicle for personal errands on their way to work, right?

"A. That is correct.

"Q. And they are not to use the company vehicle after they complete their last job on the way home for personal errands, correct?

"A. That's correct."

"Q. If they stop to pick up their children from school or pick up their dry-cleaning . . . that would be a violation?

"A. That would be a violation."

And, finally Canfield concluded:

3

"Q. Are there specific vehicle usage policies that would apply to, for instance, food service technicians but not refrigeration technicians? [¶] . . . [¶]

"[A.] There is this one policy that I'm aware of.

"Q. And that would apply to all the techs who use company vehicles?

"A. Correct."

In short, according to Canfield, Raley's single, uniform policy refuses to count drive time as hours worked and forbids use of the company vehicles for personal use. Raley's policy applies to all technicians. Raley's current employees, Vincent Matteucci, Danny Bettridge, Edward Moss, Sr., and Nathan Schoonmaker confirmed the same policies in their testimony. They were prohibited from using company vehicles for personal use, a policy they followed.

Canfield was equally unequivocal about the Raley's requirement that technicians drive company vehicles. Again we turn to his testimony.

"Q. When you say 'fleet,' what are your referring to?

"A. Our maintenance department vehicles that are assigned to each person that their job responsibilities require them to have a vehicle.

"Q. Who would that be?

"A. Refrigeration technicians, food service technicians, supervisors that are assigned vehicles.

"Q. Anyone else, other than food service and refrigeration, that uses a company vehicle?

"A. Our fixture installation, carpenters.

"Q. Anyone else?

"A. Electricians."

Canfield's testimony confirms that the putative class members were assigned company vehicles and were required to use them. Moreover, not a single technician testified he did not drive a company vehicle. In addition, the document entitled

4

"Facilities/Maintenance Department Policy" states: "The company vehicle is to be used for the transportation of tools and materials. It is not to be used to transport any personal property other than tools used in the daily work."

According to plaintiffs, Raley's promulgated a policy that eliminated the drive time from home to the stores in the morning and drive time to home from the stores in the afternoon from "time worked." Michael Helzer, the head of the Maintenance Technician Department, attested to the existence of the policy for all technicians. He testified as follows:

"Q. So the time from the house driving to the first store is not compensable, correct?

"A. Correct. [¶] . . . [¶]

"Q. But then after they finish their last job and drive home, that's not compensable according to Raley's --

"A. Correct. [¶] . . . [¶]

"Q. The testimony that you gave earlier about not compensating from the house to the first job and not compensating from the last job home, drive time -- do you remember that?

"A. Yes.

"Q. -- that's common for all techs, correct? [¶] . . . [¶]

"[A.] To my knowledge, yes."

Several of Raley's employees confirmed the same policy. They did not believe that driving to and from work counted as hours worked at Raley's.

**Uniform Policy or Practice Regarding Meal Time**

Plaintiffs testified or declared that, pursuant to company policy, they were instructed to record only eight hours of work in a nine-hour shift unless overtime had been specifically approved by a supervisor. Using the company software at the time,

5

there was no place to record start and stop times for meals. Technicians received no policy or training information authorizing them to take an hour off-duty meal period; nor would such a meal break be possible given their work requirements. They often ate while driving from job to job.

After this lawsuit was filed, John Nesbitt, Raley's person most knowledgeable about wage and hour compliance, became concerned that Raley's maintained no records of start and stop times for shifts worked or for meal breaks. Raley's thereafter changed software programs.

Gerald Landers, Raley's senior director of human resources, explained that Raley's assumes that technicians are provided meal breaks because it is policy they remain in the field for nine hours but only record eight hours of work. Raley's, therefore, automatically deducts one hour of pay from technicians' daily "hours worked." He admitted that Raley's does not have a written policy to provide meal breaks in its collective bargaining agreement and he does not know whether technicians actually receive an uninterrupted, off-duty break during the work day.

**Uniform Policy Regarding Personal Tools**

Again it is Raley's own witnesses who attest to the relevant and uniform policy. A supervisor, Ross Wasson, declared that his direct reports used their own personal hand tools. Danny Bettridge testified:

Q. "When you began working at Raley's, did Raley's supply you with the tools for your briefcase?

"A. No.

"Q. How did you -- where do the tools come from that you use for work?

"A. I purchase the tools.

"Q. And did Raley's reimburse you for those?

"A. No."

6

No employee testified or declared to the contrary. Technicians were uniformly expected to supply their own personal tools.

**Raley's Insists There Were no Uniform Policies**

Despite the testimony of Raley's persons most knowledgeable attesting to the universality of the policies or practices plaintiffs allege, Raley's submitted declarations by a number of employees to demonstrate that, in fact, the practices varied depending on the supervisor, the position, the employee, and the reality of the day-to-day execution of the very different jobs performed by the different types of technicians.

As to whether technicians were required to drive company vehicles and were allowed to run personal errands while they were on the clock with company vehicles, Raley's points out that the vehicle usage policy Canfield provided employees did not prohibit personal use of company vehicles. The policy was silent as to personal use. A separate department vehicle policy states that company vehicles "are for company use only" and should not be used for personal errands "if taken home for the night." Raley's insists there is nothing in the latter document that prohibits employees from using company vehicles for personal errands on their way to or from work, during meal periods, or while scheduled to work on-call shifts. Personal use, according to Raley's, is prohibited only if the employee takes the vehicle home at night. Several employees, in depositions or declarations, testified on behalf of Raley's that they had used company vehicles to run personal errands. Raley's also contends the recording of drive time at the beginning and ending of each day varied from person to person.

Raley's policy was to allow technicians to take an hour off duty for meals. But again, Raley's asserts the way in which technicians recorded meal time varied from person to person.

Raley's has no written policy regarding technicians' hand tools. It does have a general reimbursement policy for "approved business-related expenses with appropriate

7

documentation." Several technicians testified they were reimbursed for repairing their personal tools that were broken in the course of employment. In short, some technicians requested reimbursement and received it, others did not.

The trial court refused the technicians' request for class certification. Following two hearings and extensive discovery, the trial court ruled in relevant part: "Plaintiffs' motion for class certification is DENIED. Plaintiffs fail to establish that a well-defined community of interest exists among the proposed putative class members. Based on the evidence presented, the common issues of law and fact do not predominate as required to support class certification under Code of Civil Procedure section 382. (*Dailey v. Sears, Roebuck & Co*. (2013) 214 Cal.App.4th 974, 992-995; *Brinker Rest. Corp. v. Superior Court* (2012) 53 Cal.4th 1004; *Arias v. Superior Court of San Joaquin Count*y (2009) 46 Cal.4th 969, 977, fn. 2.[)]"

## DISCUSSION

## I

**Standard of Review**

For nearly a century, California law has guaranteed wage and hour protection to employees and class actions, as fashioned by the Legislature, provide a practical vehicle for vindicating those rights where common issues of law and fact predominate. (*Brinker Restaurant Corp. v. Superior Court, supra*, 53 Cal.4th 1004; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319.) Code of Civil Procedure section 382 authorizes class actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." Indeed, "[t]his state's public policy supports the use of class actions to enforce California's minimum wage and overtime laws for the benefit of workers." (*Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1141.) The parties seeking class certification have the burden of establishing a well-defined community of

8

interest among class members.  (*Sav-on Drug Stores, Inc. v. Superior Court, supra*, at p. 326.)

Trial courts have wide discretion to approve or deny class certification and appellate courts normally review the court's decision for an abuse of discretion.  (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1297.)  However, deference does not mean abdication.  Moreover, "This deferential standard of review . . . is inapplicable if the trial court has evaluated class certification using improper criteria or an incorrect legal analysis." (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1530.)  If the trial court utilizes improper criteria or incorrectly analyzes the case, an appellate court is required to reverse even if there is substantial evidence to support the trial court's decision.  (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828-829.)

As a consequence, we must review the trial court's reasons for denying class certification.  "In reviewing an order denying class certification, we consider only the reasons given by the trial court for the denial, and ignore any other grounds that might support denial." (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1447.)  The problem here is that the trial court parroted the ultimate finding needed to deny certification but did not provide any insight into its analytic route in reaching that finding.  In short, the trial court did not provide the reasons for its ultimate finding thereby foreclosing the type of review dictated by the standard of review of a denial of class certification.  We cannot review the trial court's finding of ultimate facts in denying class certification without some insight into the analytical route by which the trial court reached its finding.  The trial court's failure to explain itself is fatal.  A trial court cannot stymie appellate review by simply remaining mute and thereby failing to reveal whether it used either improper criteria or an incorrect legal analysis.

## II

**Important Precedent in Wage and Hour Class Actions**

The facts in *Jones, supra*, 221 Cal.App.4th 986, bear notable similarity to the facts before us.

In *Jones*, insurance claims representatives filed a class complaint against Farmers Insurance Exchange (Farmers) seeking damages for violations of California's wage and hour laws. (*Jones, supra*, 221 Cal.App.4th at pp. 988-989.) Similar to the technicians' claims for drive time, the plaintiffs' theory of recovery was that Farmers applied a uniform policy denying all putative class members compensation for " 'computer sync time' " they performed at home before the beginning of their shift. (*Id.* at p. 996.) Farmers, like Raley's, insisted it had no uniform policy denying putative class members for off-the-clock work. Rather individual issues, in Farmers's view, made class treatment ill advised. Farmers argued that individual issues included "determining what tasks each employee performed before the beginning of his or her shift, whether such activities were de minimis and whether the employee's supervisor was aware of any off-the-clock work. It filed declarations by APD claims representatives and others stating generally that they were not required to perform unpaid preshift work, that they requested and received approval to work overtime if necessary, and that the time required to start up their computers in the morning and access the ServicePower program was minimal." (*Id.* at p. 996.)

Like here, the trial court concluded that common issues of law or fact did not predominate over individual issues and class certification would not provide substantial benefits to litigants and the courts. (*Jones, supra*, 221 Cal.App.4th at p. 989.) The Court of Appeal reversed and, contrary to the trial court, held that common issues predominated. The court explained that the existence of a uniform policy "is a factual question that is common to all class members and is amenable to class treatment.

10

Whether such a policy, if it exists, deprives employees of compensation for work for which they are entitled to compensation is a legal question that is common to all class members and is amenable to class treatment." (*Id.* at p. 996.)

The court concluded "that the trial court applied improper criteria by focusing on individual issues concerning the right to recover damages rather than evaluating whether the theory of recovery is amenable to class treatment." (*Jones, supra*, 221 Cal.App.4th at p. 997.) The court further explained: "Plaintiffs' theory of recovery based on the existence of a uniform policy denying compensation for preshift work presents predominantly common issues of fact and law. Farmers's liability depends on the existence of such a uniform policy and its overall impact on its APD claims representatives, rather than individual damages determinations. [Citation.] Moreover, the trial court erred to the extent that its ruling was based on its evaluation of the merits of Plaintiffs' claim as to the existence of such a uniform policy." (*Ibid.*)

Raley's evidence and arguments were nearly identical to those introduced by Farmers in *Jones.* It too vehemently denied any uniform policies or practices regarding drive time, meal time, or reimbursement for the technicians' personal tools. It too submitted declarations by individual employees stating they had completed personal errands in company vehicles, they never were denied an hour for meals, and they either were not required to purchase tools or they were reimbursed when they did.[1]

Unlike the trial court in *Jones*, however, we cannot ascertain whether the trial court relied on this evidence or other considerations. Whereas the trial court in *Jones* articulated its reasons for denying class certification which, the Court of Appeal determined, were based on improper criteria, the trial court did not provide us with the reasons for finding that common issues did not predominate. Raley's central argument,

---

[1] Because we must remand the case to the trial court for a statement of reasons, we need not address the technicians' objections to Raley's declarations.

11

however, mirroring the same argument raised by Farmers, is that individual issues render a class action unmanageable and unadvisable. Given the risk the court may have focused on the individual issues concerning the right to recover damages rather than the technicians' theory of recovery, we must reverse and remand.

In *Ayala, supra*, 59 Cal.4th 522, the trial court denied class certification on grounds similar to the trial court in *Jones*. "It concluded common issues did not predominate because resolving the carriers' employee status would require 'heavily individualized inquiries' into Antelope Valley's control over the carriers' work. Moreover, the claims for overtime and for meal and rest breaks would require additional claim-specific individualized inquiries. Because individual issues predominated, class resolution of the claims was not superior to individual lawsuits by each carrier." (*Id.* at p. 529.) The Supreme Court reiterated the standard of review: "We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Id.* at p. 530.)

What is particularly relevant about *Ayala* is the Supreme Court's observation that the trial court lost sight of the threshold and dispositive question. At the certification stage, "the relevant inquiry is not what degree of control Antelope Valley retained over the manner and means of its papers' delivery. It is, instead, a question one step further removed: Is Antelope Valley's right of control over its carriers, whether great or small, sufficiently uniform to permit classwide assessment?" (*Ayala, supra*, 59 Cal.4th at p. 533.) Framing the right question, it turns out, can be dispositive. The court explained: "The difficulties with the court's ruling on class certification thus lie not in the answers given, but the questions asked. A certification decision is reviewed for abuse of discretion, but when the supporting reasoning reveals the court based its decision on erroneous legal assumptions about the relevant questions, that decision cannot stand. [Citations.] . . . That some other analytical path might, on this record, support the same

disposition matters not; because the reasons given are unsound, the ruling must be reversed." (*Id*. at pp. 537-538.)

At issue in *Ayala* was whether the putative class members were employees or independent contractors. The trial court focused on the multitude of ways in which Antelope Valley exercised or did not exercise control over the plaintiffs. But, as the court admonished, the question was not how the newspaper exercised control but whether it had the right to control. Pertinent to disposition of the appeal of the denial of class certification was the determination whether the right to control was common to all the carriers.

Similarly, the technicians allege that Raley's retained the right to control them whenever they were driving company vehicles, which included the drive time to the first store in the morning and home from the last store they serviced in the afternoon. As in *Ayala*, the question is not whether different managers exercised control in a myriad of ways with different categories of technicians, but whether, as the technicians allege, Raley's had the right to control. From the trial court's cursory finding, we cannot determine whether it understood the distinction and therefore whether it relied on improper criteria or inaccurate assumptions. The trial court need not resolve that question on the merits, but it must properly articulate the question so as to determine whether the right to control is a common question amenable to class treatment.

### III

### *Dailey v. Sears, Roebuck & Co.*

Relying on *Dailey v. Sears, Roebuck & Co., supra*, 214 Cal.App.4th 974 (*Dailey*), Raley's insists the trial court's order is not deficient. Raley's maintains the court stated all that needed to be said and the record can fill in the gaps. We agree that *Dailey* supports the trial court's perfunctory order. But we must disagree with the court's

13

analysis in *Dailey* because it is inconsistent with the well established standard of review of a decision to deny class certification in a wage and hour case.

To reiterate the standard of review, we turn to the succinct synopsis provided by the Fourth District in *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932 as follows: "Trial courts have discretion in granting or denying motions for class certification because they are well situated to evaluate the efficiencies and practicalities of permitting a class action. [Citation.] Despite this grant of discretion, appellate review of orders denying class certification differs from ordinary appellate review. Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling." (*Id.* at p. 939.)

The court's reasoning in *Dailey* stands in stark contrast to this rather unusual standard of review. The putative class members argued the trial court failed to sufficiently explain its reasons for denying class certification. The Court of Appeal acknowledged the appropriate standard of review, but immediately undermined it. The court recognized that the trial court was required to state its reasons and that, on appeal, the appellate court was required to ignore any grounds, other than the grounds provided by the trial court. But the court went on to do just that.

The court in *Dailey* excused the court's "succinct" order noting "the law does not demand great detail from the trial court." (*Dailey, supra*, 214 Cal.App.4th at p. 986.) In a blatant contradiction to the standard of review compelling appellate review of only the trial court's reasons, the court deemed the order sufficient for review purposes "so long as the basis for the court's ruling may be discerned from the record." (*Ibid.*) The record assured the *Dailey* court the trial court had considered all the submissions and arguments of counsel and cited appropriate legal principles. The court concluded: "To be sure, a

14

more detailed explanation of the basis for a class certification ruling generally is desirable. The law, however, does not require any particular level of detail. We conclude the trial court's order, elucidated by the parties' briefing and oral arguments, is sufficient to permit meaningful appellate review in this case." (*Id*. at p. 987.)

To turn to the record to concoct some basis for the trial court's denial of certification is to abolish the relevant standard of review, ignore the trial court's reasoning, and apply ordinary appellate review contrary to the legion of cases that prohibit appellate revisionism. This we cannot do. The Supreme Court has clearly stated: "We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala, supra*, 59 Cal.4th at p. 530.) The court in *Dailey* violated this basic precept. We reject Raley's reliance on a case at odds with the fundamental scope of our task as defined by the Supreme Court.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court to articulate a statement of reasons for approving or denying class certification. Plaintiffs shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                                                 RAYE            , P. J.

We concur:

       HULL              , J.

       MURRAY          , J.

15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| ROGER MYERS et al., | C075125 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV112668) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| RALEY'S, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Yolo County, Daniel P. Maguire, Judge. Reversed with directions.

Righetti Glugoski, Matthew Righetti, John Glugoski and Michael Righetti for Plaintiffs and Appellants.

Delfino Madden O'Malley Coyle & Koewler, Daniel J. Coyle and Shaye Schrick for Defendant and Respondent.

THE COURT:

The opinion in the above-entitled matter filed on February 13, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:

_____RAYE_____, P. J.

_____HULL_____, J.

_____MURRAY_____, J.

2