Filed 4/25/22  Wong v. Foster Farms CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SERENA WONG, et al.,<br><br>    Plaintiffs and Appellants,<br>v.<br>FOSTER FARMS, LLC, et al.,<br><br>    Defendants and Respondents. | A161435<br><br>(Alameda County<br>Super. Ct. No. RG17865531) |

Plaintiffs Serena Wong and Vicki Gruman appeal from an order denying class certification in an action they filed against defendants Foster Farms, LLC and Foster Poultry Farms for violations of state law, alleging those companies' federally regulated poultry products are misleading and mislabeled due to the products containing an amount of retained water greater than that which is displayed on the products' labels.  Plaintiffs contend reversal is required for several reasons, including that the trial court's ruling rests upon an improper merits determination and an erroneous factual assumption.  We disagree and affirm the order denying class certification.

1

## BACKGROUND

### An Overview of the Federal Law on Labeling Poultry Products

Poultry labels are federally regulated under the Poultry Products Inspection Act (PPIA) (21 U.S.C. § 451 et seq.), empowering the United States Secretary of Agriculture (USDA) to ensure that "poultry products . . . are . . . not adulterated, and properly marked[, and] labeled." The USDA delegated authority to the Administration of Food and Inspection Service (FSIS) to oversee the labeling of poultry products. (9 C.F.R. § 300.2(a) & (b)(2).)

During processing, recently slaughtered poultry carcasses are chilled to cool them down to a safe temperature. (9 C.F.R. §§ 381.65, 381.66.) An establishment must utilize poultry washing, chilling, and draining practices and procedures that will minimize water absorption and retention at the time of packaging. (*Id.*, § 381.66, subd. (d)(1).) The water that is retained in raw poultry as an unavoidable consequence of post-evisceration processing used to meet applicable food safety requirements is referred to as "retained water." (*Id.*, § 441.10(a).) Raw poultry that retains water must bear a statement on the label stating the maximum percentage of water that may be retained (e.g., "up to X% retained water"). (See *id.*, § 441.10(b).)

In order to produce poultry products containing any amount of retained water, poultry producers like defendants must "maintain on file and make available to FSIS its written data-collection protocol," which must explain how data will be collected and used to demonstrate the amount of retained water in the product. (9 C.F.R. § 441.10(c)(1).) FSIS reviews the protocol from the poultry producer and "may object to or require the establishment to make changes in the protocol" (*id.*, § 441.10(c)(2)) if it finds "that the protocol is not valid, or that the data collected under it will not be sufficient to demonstrate that the amount of retained water is an unavoidable

2

consequence of the process used to meet food safety requirements." (Retained Water in Raw Meat and Poultry Products; Poultry Chill Requirements, 66 Fed.Reg. 1750, 1763 (Jan. 9, 2001).)[1]

The federal regulations, however, do not dictate to poultry producers any particular data collection protocol to use. (66 Fed.Reg. at p. 1759.) Nor do they set a specific limit on the amount of retained water that is allowed. (*Ibid.*)

The PPIA contains a preemption provision that preempts state law if (1) the state law imposes marking, labeling, packaging, or ingredient requirements, and (2) those requirements are "in addition to, or different than" the requirements imposed under federal law. (21 U.S.C § 467e.) Thus, any state may, consistent with the requirements of the PPIA and implementing regulations, exercise concurrent jurisdiction over products required to be inspected under the PPIA for the purpose of preventing the distribution of products that are "adulterated or misbranded." (*Ibid.*)

---

[1] The parties disagree on whether the FSIS "approves" a data collection protocol where, as here, it reviews an establishment's protocol and does not object to it. As a practical matter, the FSIS has referred to its decision not to object to a protocol as an "approval" of that protocol. (See 66 Fed.Reg. at p. 1751 ["Establishments would be required to collect data, in accordance with a protocol *approved* by FSIS, and demonstrate that water retention is an unavoidable consequence of the process used to meet a food safety requirement"], italics added; *ibid.* ["FSIS . . . would accept data generated from an *approved* protocol to support water retention levels"], italics added; accord, *Webb v. Trader Joe's Co.* (9th Cir. 2021) 999 F.3d 1196, 1202 ["FSIS's decision not to object or otherwise require changes operates as federal approval of that protocol"].) We defer to the FSIS's interpretations of the PPIA and its implementing regulations. (See *Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 729; *Stinson v. United States* (1993) 508 U.S. 36, 45.)

**The Parties, the Pleadings, and the Demurrers**

Plaintiffs and appellants are Serena Wong and Vicki Gruman[2] (collectively, plaintiffs), California residents who purchased raw Foster Farms-branded poultry products. Defendants and respondents are Foster Poultry Farms, LLC and Foster Farms, LLC (collectively, defendants), companies that processed, packaged, labeled, and distributed poultry products.[3]

In June 2017, the original complaint was filed, and one month later, the first amended complaint. It was a putative class action that alleged eight causes of action: (1) breach of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.); (2) breach of the California Unfair Competition Law's (UCL) prohibition on unfair business practices (Bus. & Prof. Code, § 17200 et seq.); (3) breach of the UCL's prohibition on unlawful business practices (*ibid.*); (4) false advertising (*id.*, § 17500); (5) breach of express warranty; (6) breach of implied warranties (Com. Code, § 2314); (7) theft by false pretenses; and (8) unjust enrichment. These causes of action were all centered around the theory that the Foster Farms-branded poultry products sold to plaintiffs were misleading and mislabeled because they contained a percentage of retained water greater than that which was displayed on the labels, according to plaintiffs' own testing of the products.

Defendants filed a demurrer primarily on the ground that plaintiffs' causes of action were preempted by the PPIA. In January 2018, then Judge

---

[2] Gruman was added as a plaintiff in the operative, fourth amended complaint and prior to that, another plaintiff was dismissed.

[3] Also named as defendants are Vons Companies, Inc.'s (Vons) and Ralphs Grocery Company's (Ralphs), whose grocery stores were alleged to have sold Foster Farms-branded products to plaintiffs. Vons and Ralph's are not parties to this appeal.

(now Justice) Ioana Petrou heard the demurrer.  She found the first amended complaint alleged various theories as to how the chicken labels were inaccurate.  Thus, it was "not entirely clear whether plaintiffs are alleging a claim that seeks to impose labeling requirements different from or additional to those imposed by the PPIA."  On that basis, Judge Petrou sustained the demurrer with leave to amend.

In February 2018, plaintiffs filed a second amended complaint, after which defendants filed another demurrer on preemption grounds.  Judge Petrou again found the allegations were "not clear . . . on what constitutes the wrong."  Plaintiffs alleged two "materially different theories:  (1) that [defendants] mislabeled [their] chicken products because they contained more retained water at the time they were packaged than disclosed; and (2) that [their] chicken products violated labeling guidelines because the packaging contained more liquid at the time of consumption and testing by the Plaintiffs than was disclosed in the 'retained water' disclosure."  Judge Petrou found the second theory was preempted.  That theory relied on the premise that "purge" or "weep"—the naturally occurring liquid that seeps out of a product after it is packaged and as it sits on the grocery shelf or in a customer's refrigerator—should be counted as retained water.  Because purge is not retained water within the meaning of the PPIA,[4] Judge Petrou held that the second theory imposed a standard "in addition to, or different than" the federal statute and regulations.  Judge Petrou sustained the demurrer with leave to amend to allow plaintiffs to clarify their theory of liability.

---

[4]  (See FSIS's "Compliance Guidelines for Retained Water" (June 2005), <https://www.fsis.usda.gov/guidelines/2005-0001>, Question No. 33, p. 13; FSIS, "Water in Meat and Poultry," <https://www.fsis.usda.gov/food-safety/safe-food-handling-and-preparation/food-safety-basics/water-meat-poultry> [as of Mar. 17, 2022].)

Days after that ruling, plaintiffs filed a third amended complaint, which reasserted the same eight causes of action. Plaintiffs alleged they purchased defendants' poultry products and had them tested, which testing revealed that, at the time of packaging, the products included significantly more retained water than declared on the labels. According to plaintiffs, defendants packaged their poultry products by placing superabsorbent pads underneath the product, allowing them to hide most of the excess retained water from the consumer. Thus, plaintiffs asserted "[t]he products are falsely labeled at the time [they] are packaged in [defendants'] facility because they do not accurately disclose the amount of water included in the products as retained water," in violation of the PPIA "as well as California law." Plaintiffs alleged they were harmed by paying more for economically adulterated and misbranded products.

Defendants filed another demurrer, arguing that plaintiffs' methodologies for testing defendants' products were not credible. Judge Petrou rejected this argument and overruled the demurrer. She found that plaintiffs "pleaded that [defendants] mislabeled [their] chicken products by packing them with more retained water than was disclosed on their labeling, in violation of the standards set by the PPIA and its implementing regulations." That theory, Judge Petrou determined, "can support claim for relief."

In June 2019, the operative, fourth amended complaint was filed, adding Gruman as a plaintiff, but otherwise reasserting the same allegations and causes of action as the third amended complaint.

**The Motion for Class Certification**

On September 24, 2019, plaintiffs filed their motion for class

6

certification.[5]  Plaintiffs sought to certify a class and two subclasses of California consumers who purchased Foster Farms-branded poultry products during the class period.

Under the heading "Summary of Facts and Common Proof" in their motion, plaintiffs stated that after they had purchased defendants' products, they had those products tested and found that the products contained an unlawful excess of retained water.  Plaintiffs offered evidence of their post-purchase testing as support of their claim.

As material here, plaintiffs also argued that defendants' own data produced in discovery "confirmed" the findings from plaintiffs' own testing. In support, plaintiffs presented as their own evidence defendants' "Moisture Gain Evaluation" for one of defendants' processing facilities.  Moisture gain data, plaintiffs described, "revealed bird weights before and after the poultry underwent the wet chilling process."  Because the moisture gain percentages were denoted in defendants' documents as "% $H_2O$ retained," plaintiffs and their expert Dr. Goedde assumed that the moisture gain percentages measured, and were equivalent to, the amount of retained water in defendants' products.  And because the "% $H_2O$ retained" numbers were higher than the percentages of retained water that were stated on the

---

[5] Plaintiffs also filed a motion to file under seal their class certification motion and several documents.  The motion was granted, and plaintiffs filed under seal the certification motion and two exhibits attached to their attorney's declaration:  defendants' sales data on poultry products and the report of plaintiffs' damages expert, Dr. Alan Goedde, which referenced the sales data.  Those documents were also filed under seal in this court.  We have reviewed the publicly filed versions of the documents and have concluded that we do not need to use or rely upon the unredacted version of the documents filed under seal, with the exception of Dr. Goedde's report, which we cite to without any specific detail.

products' labels, plaintiffs argued that defendants falsified their product labels.

Defendants filed an opposition to the motion, along with evidentiary objections to, and a motion to strike, Dr. Goedde's report and opinions, among other evidence presented by plaintiffs. The opposition was accompanied by the declaration and report of Alling Yancy, DVM, their food safety and product regulatory compliance consultant, and the declaration of Casey Fripp, their Director of Food Safety and Quality Assurance. Fripp's declaration in turn attached as exhibits defendants' "Protocol for Evaluating Retained Water in Single Ingredient Poultry Product" they submitted to the FSIS in June 2015 and an August 2015 letter from the FSIS stating it had "no objection to the submitted protocol."

Defendants argued that plaintiffs failed "to show that they will be able to come forward with classwide evidence establishing the falsity of the retained water statement," thereby "mak[ing] class treatment unsuitable." Defendants asserted that plaintiffs' evidence and expert opinions relied on certain measurements that they incorrectly assumed reflected the amount of retained water in defendants' products. First, defendants and their expert Yancy explained that plaintiffs did not measure retained water during their post-purchase testing of defendants' products because their measurements included purge. Defendants noted that Judge Petrou previously determined that any theory of liability that purported to count purge as retained water was preempted as a matter of law. As such, defendants argued that plaintiffs could no longer pursue such theory on class certification.

Second, defendants argued that plaintiffs and their expert incorrectly assumed that defendants' moisture gain data measured retained water. By way of background, Fripp explained in his declaration how defendants

8

measured and labeled the amount of retained water in their poultry products, an explanation supported by the following evidence which is not disputed.

In June 2015, defendants submitted a data collection protocol to the FSIS for review. In August 2015, FSIS replied to defendants, stating it reviewed the protocol and had "no objection to [it]."

Under that protocol, Fripp explained, defendants measured retained water using a chemical analysis referred to as "oven drying" testing. This test is a destructive test in that the poultry is destroyed during the process, and includes the following steps: "A. The carcass goes through the water immersion chilling process and is then allowed to hang and drip for six to eight minutes. The hang time of the carcass varies to account for the differing length of time it takes to process a carcass from the time it leaves the chiller until it is finally packaged on each individual line . . . [¶] B. After the hanging and dripping time is complete, the carcass is ground up and weighed. [¶] C. The ground up carcass is then heated until all moisture is eliminated, which basically turns the carcass into dust. [¶] D. The weight of the dry sample . . . is then compared to the weight of the sample before the oven drying to determine the percentage of moisture in the product. [¶] E. The percent of naturally occurring moisture published by the USDA for a whole raw chicken fryer, which is 66%, is then subtracted from the moisture derived from the oven drying test. [¶] F. The result is the percentage of retained water."

Next, Fripp stated that defendants calculate the percentage of moisture gain as a way to validate the measurement of retained water under the oven drying test through "check[ing] or verif[ying] . . . the day-to-day operations at the plant." Chiller moisture gain percentage is derived from weighing a carcass before it enters the chiller and after the carcass exits the chiller and

9

is allowed to hang for the pre-determined processing time. The difference between the pre-chiller weight and the post-chiller weight, divided by the pre-chiller weight, equals the percentage of chiller moisture gain. Fripp stated, "By measuring the amount of chiller moisture gain, [defendants are] verifying that the processing of poultry is operating under the same conditions that were used to establish the retained water statement." Fripp then clarified that under defendants' protocol, moisture gain "is not a measurement of retained water."

Based on this evidence, defendants maintained that plaintiffs, in arguing that defendants should have used moisture gain to measure retained water, required defendants to conform to a data collection protocol different from the one they had properly developed for, and submitted to, the FSIS as required by federal law.

Plaintiffs filed a reply, accompanied by the report of their "rebuttal expert" Marianne Delperdang, who opined that defendants' moisture gain data "show[ed] the amount of retained water." That data, she concluded, demonstrated that the percentage of retained water in defendants' products exceeded that which was reflected in the labels.

Defendants filed a sur-reply and a motion to strike Delperdang's report. In their sur-reply, defendants asserted that "plaintiffs continue to insist on a different way to determine retained water (via moisture gain testing), which means they have (again) confirmed that they are attempting to impose non-identical requirements and, therefore, are pursuing a preempted theory of liability. Because oven-drying testing is the proper PPIA-compliant method to determine retained water—and because [defendants'] oven drying results confirm the challenged retained water label statements—plaintiffs have also failed to establish classwide evidence of deception."

10

Before the August 18 hearing on the motion, Judge Brad Seligman issued a tentative ruling ordering that they be prepared to discuss the following issues at the hearing: "Plaintiffs' papers are not clear on how, exactly, [defendants] violated the [PPIA] and federal retained water regulations. The Court sees three possible theories supported to different degrees by Plaintiffs' evidence: (a) Did [defendants] err by failing to disclose the amount of liquid that would be in packaging at the point of sale or consumption? (b) Did [defendants] err by failing to disclose the amount of moisture gain as measured immediately after poultry carcasses are removed from an immersion chiller before further processing and packaging? (c) Did [defendants] err by failing to disclose the amount of retained water as determined under the oven-drying testing protocol it submitted to FSIS? Or (d) did [defendants] violate the PPIA and federal regulations in some other way not mentioned here?"

At the August 18 hearing, Judge Seligman and plaintiffs' counsel engaged in a lengthy discussion aimed at clarifying the theory of liability upon which plaintiffs sought class certification. Ultimately, Judge Seligman confirmed plaintiffs were asserting two bases for liability under the PPIA. Those theories were first, that defendants' retained water label statements violated the PPIA because they did not "reflect [their] moisture gain measurements" (the "moisture gain theory"); and second that defendants' "protocol . . . itself creates a class certification issue because either they misrepresented something or they violated something in the [PPIA] in their own protocol" (the "protocol theory").

Judge Seligman then asked plaintiffs' counsel to identify where in the record plaintiffs asserted the protocol theory. When counsel could not provide any supporting record citations, Judge Seligman gave plaintiffs one

11

week to file a statement showing "where in [their] papers [they] made those arguments and what evidentiary support there is."[6]

One week later, plaintiffs filed a statement acknowledging that at the hearing, "they argued a theory of their case that the protocol submitted by the defendant[s] doesn't comply with the PPIA and/or defendant's [*sic*] did not follow the submitted protocol." Plaintiffs then stated, "the Court was correct and no relevant page citations exist" in their certification papers concerning those theories. Plaintiffs, however, intended to file a motion for leave to amend their complaint to allege the new theories. Such motion was later filed.

On September 14, Judge Seligman denied the motion for class certification by order. First, pointing to plaintiffs' evidence based on their post-purchase laboratory testing and use of measurements that included purge, Judge Seligman stated "[p]laintiffs' evidence of common issues of law and fact only relate to theories of liability that the Court has already twice considered and rejected" as preempted in the prior demurrer rulings.[7]

---

[6] Judge Seligman also explored whether it was necessary to hold an evidentiary hearing to address defendants' challenges to the admissibility of Dr. Goedde's and Delperdang's reports and opinions expressed in them. The parties agreed that such a hearing was unnecessary. On the same day as the hearing, Judge Seligman granted defendants' motion to strike and sustained their objections with respect to portions of Dr. Goedde's report not at issue in this appeal. However, it does not appear that Judge Seligman ruled on the admissibility of other aspects of the report related to the issue of moisture gain. Likewise, the record does not show he ruled on defendants' motion to strike portions of Delperdang's report.

[7] Plaintiffs state "that evidence is not at issue in [this] appeal." We thus presume they no longer are pursuing the claim rejected by the court and consider it abandoned. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4; *Humes v. Margil Ventures, Inc.* (1985) 174 Cal.App.3d 486, 493.)

12

Second, Judge Seligman determined that "Plaintiffs' evidence that [defendants'] 'chiller moisture gain' measurements show higher amounts of water were retained by carcasses than was ultimately disclosed on packaging labels suffers a . . . deficiency because it does not distinguish between water retained by a carcass immediately after immersion and the amount of retained water in the final product after processing." "Likewise, it does not tend to show that [defendants] failed either to file a compliant retained water protocol or to follow that protocol during data collection." Instead, he concluded, "Plaintiffs' evidence and expert opinions were directed toward proving theories of liability, then, that were not the causes of action pleaded in [their] operative Fourth Amended Complaint."

Judge Seligman continued: "At oral argument, the Court asked Plaintiff[s] to clarify their theory of liability. Counsel stated that Plaintiffs now contend that [defendants'] retained water protocol does not comply with the requirements set forth in regulations promulgated by the [FSIS] . . . under the authority of the [PPIA]. The Court ordered Plaintiffs to submit a supplemental statement including citations to argument in their class certification papers supporting that theory of liability. The supplemental brief concedes that Plaintiffs[] made no such argument in their papers. [Citation.] Instead, it indicates that Plaintiffs intend to move for leave to file an amended complaint that clearly alleges a cause of action based on this revised theory of liability.

"Because the common issues of law and fact on which Plaintiffs seek class certification do not support the causes of action pleaded in the [fourth amended complaint], the Court does not grant certification."[8]

---

[8] Judge Seligman subsequently denied plaintiffs' motion to file a fifth amended complaint. He stated: "In multiple pleading orders up through the

13

This appeal followed.

## DISCUSSION

### The Law and Standard of Review

Class actions are statutorily authorized by Code of Civil Procedure section 382: "[W]hen the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." In order to obtain class status, the class action proponent bears the burden of establishing the propriety of class certification, which requires that the proponent "must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*).)

The Consumer Legal Remedies Act (CLRA), upon which plaintiffs' first cause of action is based, also authorizes class actions. (Civ. Code, § 1781.) The CLRA sets out four conditions that, if met, mandate certification of a class: "(1) It is impracticable to bring all members of the class before the

court's October 9, 2018 order, the court has made clear that the only claims that are not preempted are claims based on a violation of the applicable federal law (PPIA) and regulation[s]. Despite this, plaintiffs filed a massive class certification motion, which ultimately included rebuttal and sur-rebuttal briefs and numerous motions to strike and evidentiary objections, and which turned out to not be based on the permitted theory at all, as plaintiffs were forced to admit after the court asked their counsel to identify any portion of their voluminous papers that was based on the permitted theory. The motion was accordingly denied."

14

court.  [¶] (2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members.  [¶] (3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class.  [¶]  (4) The representative plaintiffs will fairly and adequately protect the interests of the class."  (Civ. Code, § 1781, subd. (b).)

Predominance is the primary class certification requirement at issue in this case.  "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'  [Citations.]  The answer hinges in 'whether the theory of recovery advanced by the proponents of certification is, and an analytical matter, likely to prove amenable to class treatment.'  [Citation.]  A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible."  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021–1022 (*Brinker*).)

Under either statute, "the question of certification [is] essentially a procedural one that does not ask whether an action is legally or factually meritorious."  (*Linder*, *supra*, 23 Cal.4th at pp. 439–440.)  But this does not mean the trial court always must ignore the merits of the case.  (See *Brinker*, *supra*, 53 Cal.4th at pp. 1023–1025.)  As our Supreme Court recognized, "issues affecting the merits of a case may be enmeshed with class action requirements . . . ."  (*Linder*, at p. 443.)  Thus, in *Brinker*, the Court held:  "To the extent the propriety of certification depends upon disputed threshold

15

legal or factual questions, a court may, and indeed must, resolve them. Out of respect for the problems arising from one-way intervention, however, a court generally should eschew resolution of such issues unless necessary." (*Brinker*, at p. 1025.)

As to how a ruling on class certification is reviewed, *Brinker, supra*, 53 Cal.4th at p. 1022 confirms the law: "On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.]' "

" 'So long as [the trial] court applies proper criteria and its action is founded on a rational basis, its ruling must be upheld.' " (*Brinker, supra*, 53 Cal.4th at p. 1022, quoting *Hamwi v. Citinational-Buckeye Inv. Co.* (1977) 72 Cal.App.3d 462, 472.) One valid reason for denying certification is sufficient. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 (*Sav-On*).)

16

**Judge Seligman Did Not Abuse His Discretion in Denying Certification**

***The Denial Was Not Based on an Improper Merits Inquiry***

Plaintiffs contend that Judge Seligman abused his discretion because he probed into the substantive merits of their operative complaint in denying class certification.[9] We disagree.

First, plaintiffs argue that Judge Seligman "denied class certification based on [its] assessment of the 'legal sufficiency' of the plaintiffs' theory of liability, a merits issue." They are mistaken. Plaintiffs' argument is in reference to Judge Seligman's statement in the order that "the alleged common issues of law and fact on which [p]laintiffs seek certification have already been held legally insufficient." Such finding was made with respect to plaintiffs' theory of liability that defendants' products violated the PPIA because the packaging contained more liquid at the time of consumption and testing by the plaintiffs than was disclosed on the "retained water" labels. Judge Seligman correctly observed that such claim had been previously considered and held preempted as a matter of law by Judge Petrou when she sustained defendants' demurrer to the second amended complaint. Thus, contrary to plaintiffs' assertion, Judge Seligman did not assess the "legal sufficiency" of their theory of liability. Rather, he simply observed that such theory already had been "weed[ed] out [as] legally meritless . . . prior to certification via [defendants'] demurrer." (*Linder*, *supra*, 23 Cal.4th at p. 440.) It was entirely proper for Judge Seligman to preclude plaintiffs from

---

[9] This is plaintiffs' second argument in their opening brief. We address it first, as it affects the resolution of their remaining arguments. We also note that plaintiffs' second argument has a sub-part, which asserts a due process challenge to Judge Seligman's failure to afford plaintiffs an opportunity to brief issues allegedly raised by him for the first time at the certification hearing. We address that claim below.

pursuing a theory on class certification that already had been rejected by the court.

Second, plaintiffs assert that Judge Seligman engaged in an improper merits analysis when he "compar[ed] [their] record evidence at the time of the hearing with that introduced by [defendants]" and concluded "that evidence did not support a final merits determination in [plaintiffs'] favor at that time." This argument also does not support reversal.

Plaintiffs are correct that the substantive merits of the complaint's allegations generally are not at issue on class certification. (*Linder*, *supra*, 23 Cal.4th at pp. 443; *Brinker*, *supra*, 53 Cal.4th at p. 1023.) By the same token, however, the focus of the class certification inquiry is on "the nature of the legal and factual disputes likely to be presented," (*Brinker*, at p. 1025) as those disputes are framed not only by the pleadings but also by the defendants' answer and affirmative defenses. (*Id.* at p. 1024, citing *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1092 [trial court may consider "how various claims and defenses relate and may affect the course of the litigation"]; see also *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450.) Because that inquiry frequently will be "enmeshed" with "issues affecting the merits of a case" (*Linder*, at p. 443), "when evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them." (*Brinker*, at pp. 1023–1024.) In particular, "whether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits." (*Id.* at p. 1024.) That is because a court must determine "whether the elements necessary to establish liability are susceptible of common proof." (*Ibid.*)

Stated differently, "a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate. To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Brinker*, *supra*, 53 Cal.4th at p. 1025.)

"[I]f the parties' evidence is conflicting on the issue of whether common or individual questions predominate . . . the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met—and doing so is not . . . an improper evaluation of the merits of the case." (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 991 (*Dailey*).) The trial court has "discretion to credit [one party's evidence on predominance] over [the other's], and we have no authority to substitute our own judgment for the trial court's respecting this or any other conflict in the evidence." (*Sav-On*, *supra*, 34 Cal.4th at p. 331.)

Thus, "a class plaintiff's theory of common proof must be more than wishful thinking; it must have a foundation in the evidence." (*Payton v. CSI Electrical Contractors, Inc.* (2018) 27 Cal.App.5th 832, 842; see *Brinker*, 53 Cal.4th at p. 1021 [instructing that a trial court must examine the plaintiff's complaint "*and* supporting declarations" in determining whether the " 'theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment' "].) Plaintiffs are "required to do more than simply show that common issues exist. Rather, plaintiffs need[ ] to 'place substantial evidence in the record that common issues predominate.' " (*Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, 1354–1355; see *Cruz v. Sun World Internat., LLC* (2015)

19

243 Cal.App.4th 367, 384, disapproved on another ground in *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15 [plaintiffs "may not simply allege" a uniform policy or practice, but must "present substantial evidence that proving both the existence of the defendant's uniform policy or practice and the alleged illegal effects of that policy or practice could be accomplished efficiently and manageably within a class setting"].)

The theory of liability that plaintiffs focus on in this appeal is their "moisture gain theory." That theory, as they frame it, is this: "[Defendants'] 'Moisture Gain' measurements calculate the same mathematical quantity as 'Retained Water' as defined under the PPIA and are therefore competent evidence tending to prove that the Products exceed their labeled Retained Water [statements]." In support of their argument that liability could be determined using common proof, plaintiffs relied on the data defendants compiled in their "Moisture Gain Evaluation" at one of their poultry processing facilities, and plaintiffs' experts' interpretations of defendants' data.

Moisture gain, calculated as the difference between the weight of a bird before and after it is immersed in the chiller, was indicated in defendants' documents as "% H2O retained." Plaintiffs thus assumed that defendants' moisture gain percentages necessarily measured the amount of retained water for purposes of the PPIA. Because the numbers quantified as "% H2O retained" in defendants' documents apparently were higher than the percentages of retained water that were stated on some of defendants' products' labels, plaintiffs argued that defendants mislabeled their products.

Defendants, of course, did not concede to plaintiffs' interpretations of defendants' own data. Defendants presented the declaration of one of their employees along with supporting documentary evidence detailing the process

20

by which they measure retained water. That evidence established that defendants submitted a data collection protocol to the FSIS; that protocol called for the oven drying testing method to measure retained water, and separately, moisture gain as a process control check on that method; and that the FSIS stated it reviewed that protocol and had no objection to it. Plaintiffs did not dispute this evidence. As such, it was undisputed that under defendants' retained water protocol, chiller moisture gain was not used to measure retained water. Defendants argued that to the extent plaintiffs insisted otherwise, they "fundamentally misunderst[ood] the import and application of the chiller moisture gain data." Also, in light of the requirements under the PPIA and its regulations that defendants measure retained water in accordance with their FSIS-reviewed protocol (9 C.F.R. § 441.10(a), (c), (d)), defendants asserted that plaintiffs failed to establish that defendants' moisture gain data provided a method to prove class-wide liability.

Judge Seligman examined both parties' evidence in light of the PPIA and its implementing regulations. He found that the factual predicate of plaintiffs' "moisture gain theory"—that defendants' moisture gain data in fact measured the amount of retained water in their products—was unsupported by the record. Specifically, he determined the moisture gain calculations relied upon by plaintiffs failed to "distinguish between water retained by a carcass immediately after immersion and the amount of retained water in the final product after processing." In other words, the evidence did not demonstrate that the measurements were taken at the point in time when "retained water" is determined for purposes of the PPIA. (9 C.F.R. §§ 381.66(d), 441.10.) In so finding, Judge Seligman appears to have credited defendants' evidence that that they submitted a protocol to the FSIS, to

21

which the FSIS did not object, and that under such protocol, moisture gain was used as a mere process control check, rather than the actual method of measuring retained water in the final product after processing.

Judge Seligman also found plaintiffs' moisture gain evidence "does not tend to show that [defendants] failed to file, or abide by, a compliant retained water protocol under FSIS's retained water regulation[s]." In so finding, Judge Seligman again apparently credited defendants' evidence that they did not use moisture gain to measure retained water. Thus, he determined that plaintiffs had no evidence tending to show that defendants incorrectly measured retained water, such that they failed in their obligations of developing and complying with a valid retained water protocol as required by federal law. (9 C.F.R. § 441.10.)

Contrary to plaintiffs' argument, Judge Seligman did not improperly make a "a final merits determination." He did not, as plaintiffs contend, "assess[] a merits question divorced from consideration of any of the criteria for class certification." Rather, under the authorities discussed above, Judge Seligman was entitled to, and did, weigh the evidence for the purpose of determining whether the class certification requirements, namely predominance, were met. (*Dailey*, *supra*, 214 Cal.App.4th at p. 991.) Specifically, he was permitted to consider the evidence in determining whether plaintiffs established the existence of an unlawful practice or procedure of mislabeling products with a classwide impact. (*Id*. at p. 989.) He was not required to simply accept plaintiffs' mere assertion that the moisture gain data provided a common method of proving class-wide liability, as plaintiffs seem to suggest. Accordingly, when Judge Seligman found that such common theory of proof had no foundation in the evidence, he was acting within his discretion.

### *The Denial Was Supported by the Record*

Plaintiffs contend the trial court denied class certification based on its erroneous factual assumption that defendants' " '[m]oisture [g]ain' measurements were taken 'before processing and packaging' and therefore did not measure '[r]etained [w]ater' because it did not reflect the condition of the [p]roducts at the point of packaging."

Initially, plaintiffs do not expressly identify the standard of review that applies to their argument. They mention in passing that where the denial of class certification is based "on erroneous assumptions, that decision cannot stand," citing to *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522. However, the cited statement was made with respect to "erroneous *legal* assumptions." (*Id.*, at p. 537, italics added.) Because plaintiffs' argument depends on the evaluation of disputed factual evidence, we review Judge Seligman's factual findings for substantial evidence. (*Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 918, citing *Sav-On*, *supra*, 34 Cal.4th at p. 328; *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1287–1288.)

On an appeal challenging the sufficiency of the evidence, an appellant's opening brief must set forth all the material evidence on point; the brief cannot merely state facts favorable to the appellant. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) "It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) When an appellant's opening brief states only the favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain every finding of fact. (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

Here, in their opening brief, plaintiffs cherry pick isolated pieces of evidence as support for a conclusion that they insist Judge Seligman should have made—that defendants' moisture gain data measured retained water. Plaintiffs do not discuss the evidence that provides the context of the data upon which they rely, much less the evidence favorable to defendants. Because plaintiffs have failed in their obligations concerning the discussion and analysis of a substantial evidence issue, we deem the issue forfeited. (*Doe v. Roman Catholic Archbishop of Cashel & Emly, supra,* 177 Cal.App.4th at p. 218.)

Even overlooking the forfeiture, substantial evidence supports Judge Seligman's finding that plaintiffs' evidence failed to establish that the moisture gain data measured retained water. Where the class certification order turns on inferences to be drawn from the facts, we have " ' "no authority to substitute [our] decision for that of the trial court." ' " (*Massachusetts Mutual Life Ins. Co. v. Superior Court, supra*, 97 Cal.App.4th at p. 1287; see *Brinker, supra*, 53 Cal.4th at p. 1022 ["We must '[p]resume in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . .' "].) As discussed, the evidence ignored by plaintiffs showed that under defendants' protocol, the oven drying method was used to measure retained water, while moisture gain testing was used as a process control check on the oven drying method. When used as a process control check, moisture gain testing, plaintiffs acknowledge, is "designed to *mimic* the Products' condition at the point of packaging." (Italics added.) Thus, the results of defendants' moisture gain testing were not used to represent the actual amount of retained water. Additionally,

24

there was no evidence that defendants did not follow their protocol.[10] Therefore, Judge Seligman could reasonably conclude that moisture gain was not a measure of, or equivalent to, the amount of retained water in defendants' final product after processing.

### *Judge Seligman Did Not Ignore the Class Criteria*

Plaintiffs argue Judge Seligman committed reversible error because he failed to address the elements for class certification in Code of Civil Procedure section 382 and Civil Code section 1781. In a related argument, plaintiffs assert Judge Seligman further erred because he did not "distinguish its reasoning applicable to the Section 382 causes of action from those governed by the CLRA Section 1781 [claim]." We disagree on both counts.

Plaintiffs are incorrect that Judge Seligman did not address any of the statutory class certification elements in the order denying the motion. Although the order does not include specific findings on each of the class criteria, the record discloses that the certification dispute turned on the element of predominance. (See *Dailey*, *supra*, 214 Cal.App.4th at p. 986 ["[E]ven if the trial court's order on class certification does not state reasons, or does so without providing detail, it will be deemed sufficient for review purposes so long as the basis for the court's ruling may be discerned from the record"].) The order repeatedly refers to and analyzes the "common issues of law and fact" identified by plaintiffs and expressly bases the denial of class certification on such analysis. At the hearing, Judge Seligman stated at the outset, "What I have to decide is, based on your theory of the case, are there . . . substantial common questions in the case[?]" Because Judge Seligman's

---

[10] Indeed, after the certification hearing, plaintiffs filed a motion for leave to amend the operative complaint to include new allegations that defendant did not follow their submitted protocol.

25

reasoning was discernible from his statements and context, we reject plaintiffs' argument that he ignored the statutory criteria for class certification.

To the extent plaintiffs suggest that specific findings must be made on each of the class criteria, plaintiffs are wrong. None of the cases that plaintiffs cite supports this point. The cited portions of those cases simply discuss general principles of class action law. (See, e.g., *Linder, supra,* 23 Cal.4th at p. 437, *Noel v. Thrifty Payless, Inc., supra,* 7 Cal.5th at pp. 968–969, *Myers v. Raley's* (2019) 32 Cal.App.5th 1239, 1247, and *Stephens v. Montgomery Ward* (1987) 193 Cal.App.3d 411, 412.) In any event, specific findings on each of the class certification criteria are not required. (*Osborne v. Subaru America, Inc.* (1988) 198 Cal.App.3d 646, 652, fn. 1.)

We also reject plaintiffs' argument that Judge Seligman committed reversible error by not distinguishing between Code of Civil Procedure section 382 and Civil Code section 1781 in his analyses. Even if the failure to distinguish between the two statutes was error—which plaintiffs have not established—they fail to demonstrate any prejudice. "An appellant bears the burden to show not only that the trial court erred, but also that the error was prejudicial in that it resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) An error is prejudicial and results in a miscarriage of justice only if the reviewing court concludes, based on its review of the entire record, that it is reasonably probable that the trial court would have reached a result more favorable to the appellant absent the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)" (*Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 999.) As defendants note, plaintiffs do not "explain what distinctions between [Code of Civil Procedure] Section 382 and the CLRA the trial court in this case should have taken into

account—much less how any distinctions would have made a difference." Accordingly, any error in failing to distinguish between the two statutory frameworks does not require reversal.

### The Due Process Challenge Fails

Plaintiffs argue that they were deprived of due process when Judge Seligman sua sponte raised new theories of liability at the certification hearing without giving plaintiffs an opportunity to brief those theories.

In the first place, the claim is forfeited because plaintiffs did not raise a due process concern below, request to present additional briefing, or otherwise object to the alleged irregularity. (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406 [" 'As a general rule, failure to raise a point in the trial court constitutes [a] of waiver and appellant is estopped to raise that objection on appeal' "]; *Geftakys v. State Personnel Board* (1982) 138 Cal.App.3d 844, 864 ["It is the general rule applicable in civil cases that a constitutional question must be raised at the earliest opportunity or it will be considered as waived"].)

The claim is also unavailing. It is based on the faulty premise that Judge Seligman himself, as opposed to plaintiffs, raised new theories of liability at the hearing. The record shows that Judge Seligman and plaintiffs' counsel engaged in a lengthy discussion aimed at clarifying plaintiffs' theory of liability because it was not clearly stated in their certification papers. During this discussion, counsel stated plaintiffs were asserting several theories of liability under the PPIA. Judge Seligman repeated those theories as he understood them and asked counsel to confirm whether his understanding was correct. In response, counsel would either state affirmatively that Judge Seligman's descriptions of plaintiffs' theories were correct or acquiesce to his descriptions by not objecting to them and proceeding to expound upon them. Thus, the record does not demonstrate

that Judge Seligman raised new theories of liability on his own initiative.  On the contrary, as plaintiffs later admitted, it was they who raised new arguments at the hearing that were not raised in their certification papers.  On top of that, plaintiffs filed a motion to file a fifth amended complaint to allege those new theories of liability.

## DISPOSITION

The order is affirmed.  Defendants shall recover their costs on appeal.

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Mayfield, J. *

*Wong v. Foster Farms, LLC* (A161435)

  *Judge of the Mendocino Superior Court, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.